**UNITED STATES of America, Plaintiff,**

**v.**

**Algimantas DAILIDE, Defendant.**

**No. 1:94CV2499.**

United States District Court,
N.D. Ohio,
Eastern Division.

Jan. 29, 1997.

As Amended Feb. 28, 1997.

William H. Kenety, Susan Masling, U.S. Department of Justice, Office of Special Investigations, Washington, DC, for Plaintiff.

Joseph T. McGinness, Cleveland, OH, for Defendant.

## MEMORANDUM OF OPINION AND ORDER

MATIA, District Judge.

This case is before the Court pursuant to the government's motion for partial summary judgment (Doc. 51).[1] On December 7, 1994, the plaintiff filed a six-count complaint seeking to revoke the citizenship of and cancel the Certificate of Naturalization issued to the defendant, Algimantis Dailide. The plaintiff seeks summary judgment on Count I, which contends that Dailide was guilty of the persecution of a civilian population in violation of section 2(b) of the Displaced Persons Act of 1948 ("DPA"), and on Count IV, claiming that the defendant made material misrepresentations during the immigration process which rendered him ineligible for admission to the United States under section 10 of the DPA. Having considered the memoranda submitted by the parties on these issues (Docs. 51–57, 65, 66, 72, 75, 88, 90, 95),[2] as

---

1. Although the motion is entitled "Motion of the United States for Summary Judgment," it embraces only two of the six counts contained in the complaint. It is therefore properly a motion for partial summary judgment.

2. On December 30, 1996, in order to alleviate the burden of trial preparation, the Court notified

well as the oral arguments presented by counsel at the December 20, 1996, hearing on the instant motion, the Court now GRANTS the government's motion for the following reasons.

## I. BACKGROUND

### A. Factual Background

The defendant, Algimantas Dailide, was born on March 12, 1921, in Kaunas, Lithuania. After Germany invaded Lithuania on June 22, 1941, the Nazis reestablished a police force in that country known as the *Saugumas*. That organization existed during the Soviet occupation of Lithuania, but had been disbanded prior to the German invasion. The defendant voluntarily joined the *Saugumas* in 1941 and served until 1944, when the force dissolved along with the Nazi regime.

After living in Germany until 1949, Dailide applied for emigration to the United States and eventually entered this country in 1950 as a non-quota immigrant. On February 3, 1955, the defendant applied for naturalization, and on September 6 of that year this Court granted the defendant's application. The defendant now resides in Brecksville, Ohio.

### B. Legal Standard for Denaturalization

■ Although denaturalization is a civil proceeding, the United States must demonstrate "by clear, unequivocal and convincing evidence" that citizenship should be revoked. *Fedorenko v. United States*, 449 U.S. 490, 505, 101 S.Ct. 737, 746–47, 66 L.Ed.2d 686 (1981). "Any less exacting standard would be inconsistent with the importance of the right that is at stake in a denaturalization proceeding." *Id.* at 505–06, 101 S.Ct. at 747. However, "there must be strict compliance with all the congressionally imposed prereq-

uisites to the acquisition of citizenship." *Id.* at 506, 101 S.Ct. at 747.

Section 316 of the Immigration and Nationality Act of 1952 ("INA"), 8 U.S.C. § 1427(a), requires that a naturalized citizen must have been "lawfully admitted" into this country. Section 340 of that Act, 8 U.S.C. § 1451(a), authorizes the government to bring suit

in any district court of the United States in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate were illegally procured or were procured by concealment of a material fact or by willful misrepresentation. . . .

### C. Legal Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and directs the Court to grant summary judgment

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law.

A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Determination of whether it is "genuine" requires consideration of the applicable evidentiary standard. *Id.* at 252, 106 S.Ct. at 2512. The Court must decide whether a reasonable trier of fact could find that the

counsel by facsimile transmission of its intention to grant the government's motion for partial summary judgment. Nonetheless, on January 2, 1997, the defendant filed an eighty-one (81) page trial brief, with seventeen (17) attached exhibits (Doc. 102). A trial brief is intended to summarize the arguments of the parties and assist the Court in preparing for trial. It is not a forum for the introduction of new evidence, and no issue concerning the propriety of admitting any such new evidence is therefore raised. Because it is separate and distinct from and irrelevant to the

summary judgment motion practice in this case, the defendant's trial brief has not been considered by the Court in formulating the instant opinion. For similar reasons, the Court in ruling on the instant motion has also declined to consider other documents filed by the defendant subsequent to the December 30 notification (Docs. 103, 104). Despite the fact that these documents are not relevant to the Court's consideration of the instant motion, the "Government's Motion to Strike Defendant's pleadings as Moot" (Doc. 107) has been denied.

non-moving party is entitled to a verdict. In reviewing the motion for summary judgment, a Court must view the evidence in the light most favorable to the non-moving party when deciding whether a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Assn., Inc.*, 909 F.2d 941, 943–44 (6th Cir.1990).

"To withstand a motion for summary judgment the opposing party 'may not rest upon the mere allegations or denials' in its pleadings, but must respond 'by affidavits or as otherwise provided ... [setting] forth specific facts showing that there is a genuine issue for trial.' Fed.R.Civ.P. 56(e). [M]ere conclusory allegations are insufficient to withstand a motion for summary judgment." *Cincinnati Bell Telephone Co. v. Allnet Communication Services, Inc.*, 17 F.3d 921, 923 (6th Cir.1994), *citing, McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir. 1990).

### D. Summary Judgment in Denaturalization Cases

█ Notwithstanding the *Fedorenko* Court's recognition of "the importance of the right that is at stake in a denaturalization proceeding," 449 U.S. at 505–06, 101 S.Ct. at 747, ample precedent exists for the revocation of citizenship at the summary judgment stage. *See, e.g., United States v. Lileikis*, 929 F.Supp. 31 (D.Mass.1996); *United States v. Koreh*, 59 F.3d 431 (3d Cir.1995); *United States v. Leprich*, 666 F.Supp. 967 (E.D.Mich.1987).

## II. COUNT I (PERSECUTION OF CIVILIAN POPULATIONS)

### A. Statutory Background

In order to qualify as an "eligible displaced person" (for purposes of emigration to the United States) under section 2(c) of the DPA, an applicant must be, among other things, "a displaced person as defined in subsection (b) above...." Subsection (b) includes "any displaced person or refugee as defined in Annex I of the Constitution of the International Refugee Organization and who is the concern of the International Refugee Organization."

The Constitution of the International Refugee Organization ("IRO"), in turn, sets forth a number of groups that are by definition not "of concern" to that body. These include, at Part II, section 2, "[a]ny other persons who can be shown: (a) to have assisted the enemy in persecuting civilian populations of countries...."

Since the defendant entered this country pursuant to the DPA, the continuing validity of his citizenship and naturalized status must be judged by reference to the standards set forth at Part II, Section 2(a), of the IRO constitution. If he is found not to be the concern of the IRO by its terms, then he is not (and never was) an "eligible displaced person" who was "lawfully admitted" to this country, and his citizenship must be revoked under 8 U.S.C. § 1451(a) because it was "illegally procured."

### B. Persecution of Civilian Populations

The government advances two alternate theories in support of summary judgment on Count I of its complaint: The first asserts that by reason of the defendant's membership in the *Saugumas* and the documented role in the persecution of the Jewish people played by that organization, Dailide is "guilty by association" of persecution. The second contends that independent of the fact of membership in the *Saugumas*, the defendant himself committed documented acts amounting to persecution that independently disqualify him according to the terms of the IRO Constitution. The Court will address each argument separately.

#### 1. Role of the Saugumas

█ The Supreme Court's decision in *Fedorenko* explained that persecution under section 2(b) may under certain circumstances be demonstrated without a showing of individual participation in persecution. Although *Fedorenko* and many of its progeny deal with armed concentration camp guards, it seems clear that the Supreme Court did not intend to limit the above rule only to camp guards. Instead, the Court indicates that the assistance question must be answered according

to the facts of each case, while making clear that individual participation is not a necessary prerequisite to liability. *Fedorenko,* 449 U.S. at 512 n. 34, 101 S.Ct. at 750 n. 34. *See Koreh,* 59 F.3d at 439 ("We have read Fedorenko as describing a 'continuum of conduct to guide the courts in deciding' how to apply the term 'assistance in persecution.' [*United States v.*] *Breyer,* 41 F.3d [884] at 890 [(3d Cir.1994)]. Thus, the term is to be applied on a case-by-case basis with reference to the relevant facts presented in each case.")

At least two cases decided after *Fedorenko* support this conclusion. In 1981, the Eastern District of Pennsylvania held that a Ukrainian policeman, against whom no specific acts of violence had been proven, nonetheless assisted in the persecution of civilians.

> Osidach's personal assignment as an armed, uniformed Ukrainian street policeman constitutes on the present record the form of mental persecution that quite naturally follows from the conspicuous public display of armed force and uniformed authority, regularly, over a long period of time in a repressive ghetto-type atmosphere. The mere presence of the watchful eye of the conqueror or his deputies, coupled with the often demonstrated presence of both the means and the inclination to persistently inflict various indignities, physical abuse, injuries or even death, without notice or reason, is the personification of mental persecution, to anyone, let alone innocent civilian men, women and children reduced to various degrees of substandard mental and physical well-being.

*United States v. Osidach,* 513 F.Supp. 51, 99 (E.D.Pa.1981).[3]

More recently, in revoking the citizenship of the chief of the *Saugumas,* the Eastern District of Massachusetts relied on testimony concerning the role of that group involving matters in which that defendant did not personally participate. *Lileikis,* 929 F.Supp. at 34–35.

■ This Court believes that the underlying rationale of those decisions and their reliance on *Fedorenko* is reasonable and appropriate, and turns now to consider the evidence at bar concerning the activities of the *Saugumas.*[4]

Utilization of local police forces like the *Saugumas* was a standard practice intended to assist the Germans in maintaining control of the local populations of conquered nations. Their responsibilities included the enforcement of anti-Jewish laws such as curfews and confinement to ghettos, prohibitions against the use of public facilities and transportation, and requirements that Jews display visibly a yellow Star of David. In addition to these general duties, the government has submitted documentary evidence exemplifying some of the more specific atrocities committed by members of the *Saugumas.*

In one instance, Gitta Kaplan and her six year old daughter Fruma, both Jewish, were arrested outside Vilnius for the offense (as described by their prison information sheets) of "escape from the ghetto." Shortly after imprisonment, both were executed at Paneriai, a forest area outside of Vilnius. In a second instance, Saulius Varsavskis and Jenta Rachmaniene, two young Jews arrested by the *Saugumas* for escaping from a ghetto, were imprisoned and later executed. In yet a third, Dovydas Palenbaumas, a Jew, was arrested by the *Saugumas,* held, and later shot. Dr. Arad has testified that hundreds

---

3. Although this issue was considered by the *Osidach* court and others under section 13 of the DPA, this Court does not believe that the distinction is material because the standard for persecution of civilian populations is identical under both sections. *See Koreh,* 59 F.3d at 437 (noting that proof of "advocacy and assistance in persecution" would render the defendant "ineligible for a DPA visa under both section 2(b) and section 13 of the DPA.") (Emphasis added.)

4. The government's evidence on this point has been supplied by its expert historian, Dr. Yitzhak Arad. Dr. Arad's role in this case has been

disputed vigorously by the defendant, both directly in the form of a motion in limine seeking to bar his testimony, and indirectly in a second motion relating to the deposition of Office of Special Investigations ("OSI") historian Michael McQueen. Both motions were denied as moot (Doc. 108), indicating the Court's belief that Dr. Arad's testimony is competent. *See also Lileikis,* 929 F.Supp. at 38 (noting the absence of "a single Holocaust scholar or American court that has questioned Dr. Arad's work" concerning the role of the *Saugumas* during the Holocaust.)

of Jews were arrested or turned over to the *Saugumas* during the summer and fall of 1941, and most were eventually shot at Paneriai.

Furthermore, the *Saugumas* was headquartered near the route on which Jewish captives were transported to Paneriai from the Lukiskes prison in which many were held. Not only does this proximity make it highly improbable that any *Saugumas* member could have been unaware of the ultimate fate of those they arrested, but the defendant himself testified that he "heard talk that (Jews) were killed in Paneriai." [5]

### 2. Specific Acts of Dailide

■ Beyond the documented atrocities committed by the organization to which Dailide belonged, which as discussed earlier would be sufficient by themselves to grant judgment for the plaintiff on Count I, the government has introduced evidence of activities by the defendant himself which provide an alternate and independent basis for this Court's holding that Dailide assisted in the persecution of civilian populations. The defendant has admitted that incident to his membership in the *Saugumas,* he sometimes searched, arrested, and questioned people.

More importantly, the government has provided evidence of two specific instances of persecution in which Dailide himself participated. One is supported by three authenticated documents. The first document is a report addressed to Aleksandras Lileikis, chief of the Vilnius *Saugumas,* detailing an arrest of several "individuals of Jewish Nationality who were escaping from Vilnius," and indicating explicitly that the defendant had participated in the arrest. The second document, also a report sent to Lileikis, relates specifically to two of the Jews arrested (Izrael and Riva Soak), and again details the individual participation of Dailide. The final document describes the fate of the fifty-two individuals arrested, indicating that they were to be shot and killed at Paneriai.

An arrest report signed by the defendant detailing his search of a Jewish prisoner

constitutes a second instance of persecution. The report indicates that the money Dailide discovered in his search was turned over to the *Saugumas.*

Accordingly, the Court finds that the defendant assisted in the persecution of civilian populations within the meaning of the IRO constitution, and was therefore ineligible for immigration to this country under section 2 of the DPA.

### III. COUNT IV (MATERIAL MISREPRESENTATIONS)

#### A. Statutory Background

The statutory scheme controlling this count is somewhat more straightforward. Section 10 of the DPA provides that "[a]ny person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person shall thereafter not be admissible into the United States." 8 U.S.C. § 1451(a) explains that in order to justify revocation of citizenship, a misrepresentation must relate to a material fact. *Kungys v. United States,* 485 U.S. 759, 774–75, 108 S.Ct. 1537, 1548–49, 99 L.Ed.2d 839 (1988). This Court must therefore determine first whether the defendant made misrepresentations for the purpose of gaining admission into this country, second whether they were made willfully, and third whether they were material to his admission. If the answer to each of these inquiries is affirmative, the government is entitled to judgment as to Count IV of its complaint as well.

#### B. Willfulness and Materiality

■ Notwithstanding the defendant's argument that the question of willfulness is inappropriate for resolution on summary judgment because it is intertwined with the issue of motive, "a specific intent to deceive ... is not required to show that these misrepresentations were willful." *See Hernandez–Robledo v. INS,* 777 F.2d 536, 539 (9th Cir.1985). *See also Bufalino v. INS,* 473 F.2d 728, 738 (3d Cir.) (Adams, J., concurring), *cert. denied,* 412 U.S. 928, 93 S.Ct.

---

**5.** For additional discussion and examples of the role of the *Saugumas, see Lileikis,* 929 F.Supp. at 34–35.

2751, 37 L.Ed.2d 155 (1973). ("[A]dministrative authorities have long interpreted 'willful' to mean 'intentional.' ") Although this Court is not aware of a case that has specifically addressed the meaning of "willfulness" under the DPA, no reason is apparent to depart from the interpretations of the foregoing authorities.

Clear guidance does exist in defining the term "material." The Supreme Court has explained that a misrepresentation is material for purposes of a denaturalization proceeding if "the misrepresentation or concealment was predictably capable of affecting, *i.e.,* had a natural tendency to affect, the official decision." *Kungys,* 485 U.S. at 771, 108 S.Ct. at 1547.

### C. The Defendant's Misrepresentations

■ The government identifies two misrepresentations made by the defendant in connection with the immigration process. It contends that both were willful and material, and are therefore grounds for the revocation of the defendant's citizenship pursuant to 8 U.S.C. § 1451(a). The Court agrees.

When applying for an immigration visa, the defendant was required to complete and sign a personal history form prepared by the United States Army's Counter Intelligence Corps ("CIC"). The following information appeared on the form completed by the defendant:

Q: Exact description of your activities and residences during the last few years.

A: . . . 1942–1944 practitioner forester in Vilnius/Lithuania. . . .

Q: All other organizations to which I have belonged—Police service.

A: No.

The defendant neither disputes the authenticity of his signature on the CIC form, nor contends that he failed to understand what he was signing. It is clear, however, that both of the above responses are false, because the defendant has admitted by affidavit that he served in the *Saugumas* during the years in question.

The defendant contends, however, that the misrepresentations were neither willful nor material, and thus do not merit denaturalization. However, as discussed above, willfulness is an objective standard. It is irrelevant whether, as the defendant suggests, he concealed his police service due to a fear of repatriation to the Soviet Union and the ensuing and potentially unpleasant consequences. *Fedorenko,* 449 U.S. at 507 n. 26, 101 S.Ct. at 747 n. 26. The undisputed fact that he did so knowingly and intentionally makes the misrepresentations willful.

■ Dailide also argues that the two misrepresentations discussed above were not material to his immigration proceedings. According to the standard set forth by the Supreme Court in *Kungys,* however, this argument must fail. The documents containing the misrepresentations were reviewed at the critical stage of the immigration process by the DPC. During discovery in this case, the deposition of anticipated defense witness Jerome Brentar was conducted. Mr. Brentar, a former IRO eligibility officer, testified that if an individual with Dailide's background had accurately represented his wartime activities, his application would have been referred to a review board in Geneva for further consideration.[6]

The plaintiff offers the affidavit of Michael Thomas who, in 1948, became the Chief Eligibility Officer of the IRO. Mr. Thomas also co-authored *The Manual for Eligibility Officers,* an application guide for organizational procedures. In short, a case referred to the review board would have been under the jurisdiction of Mr. Thomas and his staff. After considering the defendant's circumstances in this case, Mr. Thomas averred that had Dailide not misrepresented his background, he would have been ineligible for IRO relief and therefore unable to obtain an immigration visa admitting him to this country.

For the foregoing reasons, the Court finds that the defendant violated section 10 of the DPA by willfully and materially misrepre-

---

**6.** This is in contrast to the disposition of Dailide's fraudulent application, which of course was approved.

senting his background for the purpose of gaining admission into the United States.

## IV. HOLDING

As a consequence of this Court's findings, it is clear that Dailide was not "lawfully admitted" into the United States for purposes of naturalization under 8 U.S.C. § 1427(a), and that his citizenship and certificate of naturalization were "illegally procured or were procured by concealment of a material fact or by willful misrepresentation" within the meaning of 8 U.S.C. § 1451(a). The plaintiff's motion for summary judgment as to Counts I and IV of the complaint (Doc. 51) is therefore GRANTED.

IT IS SO ORDERED.