RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0019P (6th Cir.)
File Name: 03a0019p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
　　　　　*Plaintiff-Appellee,*

　　　*v.*

ALGIMANTAS M. DAILIDE,
　　　　*Defendant-Appellant.*

No. 01-3820

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 94-02499—Paul R. Matia, Chief District Judge.

Argued: October 16, 2002

Decided and Filed: January 15, 2003

Before: BOGGS, SUHRHEINRICH, and CLAY, Circuit
Judges.

_____

**COUNSEL**

**ARGUED:** Joseph T. McGinness, Cleveland, Ohio, for
Appellant. Jeffrey L. Menkin, UNITED STATES
DEPARTMENT OF JUSTICE, CRIMINAL DIVISION,
Washington, D.C., for Appellee. **ON BRIEF:** Joseph T.
McGinness, Cleveland, Ohio, for Appellant. Jeffrey L.
Menkin, UNITED STATES DEPARTMENT OF JUSTICE,
CRIMINAL DIVISION, Washington, D.C., Michael Anne

Johnson, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

---

## OPINION

---

SUHRHEINRICH, Circuit Judge. Defendant-Appellant Algimantas Mykolas Dailide, a former member of the Lithuanian *Saugumas*, a police organization that aided the Nazis in exterminating the Jewish population of Vilnius during World War II, appeals from the decision entered on June 21, 2001, in the United States District Court for the Northern District of Ohio, denying his collateral challenges to the court's order of January 29, 1997, which granted summary judgment revoking Dailide's citizenship and cancelling his certificate of naturalization. *United States v. Dailide*, 953 F. Supp. 192 (N.D. Ohio 1997) (*Dailide I*).

On appeal, Dailide raises four issues. First, he claims the federal courts lack jurisdiction to cancel his citizenship. He claims that 8 U.S.C. § 1451 only gives the federal judiciary the power to review certificates of naturalization to determine if they were "illegally procured," but does not give us the power to substitute our judgment for that of the original Immigration and Naturalization Service (INS) inspector. Furthermore, he claims that even if the courts do have jurisdiction under the Displaced Persons Act of 1948 (DPA), that act does not apply to him because it expired three years prior to his naturalization. He argues his case should have been examined under the Immigration and Naturalization Act of 1952 (INA) (the successor to the DPA), wherein he believes the courts' jurisdiction to revoke citizenship is limited to cases where the alien failed to follow correct procedural avenues.

Second, Dailide claims that the district court lacked a factual basis for its denaturalization order because, on appeal, this Court declined to address Count IV of the original complaint, which was an allegation that Dailide had made

groups of aliens, even if such group had previously been included, and this power is plenary. *See, e.g., Bartoszewska-Zajac v. I.N.S.*, 237 F.3d 710, 715 (6th Cir. 2001); *Newton v. I.N.S.*, 736 F.2d 336, 339 (6th Cir. 1984).

Dailide has not identified a suspect class to which he belongs. Although alienage is a suspect class, Dailide is not being treated differently than non-aliens. The DPA and the INA simply treat similar groups of aliens differently. However, Dailide is treated differently only because he is a former Nazi persecutor who entered the United States in 1950, as opposed to one who entered after 1952. There is no precedential basis, and no reason, for classifying this narrow group as a suspect class. *Cf. Linnas v. I.N.S.*, 790 F.2d 1024, 1032 (2d Cir. 1986) ("Nazi war criminals are not a class of persons entitled to enhanced scrutiny under the equal protection clause.").

Moreover, there is a rational basis for Congress's classification. We find it well within reason that Congress would want to limit the number of former Nazi cronies, who aided in persecuting and murdering over 6,000,000 people and who, for four years, waged war against the people of the United States, living as citizens in this country. *See, e.g., Schellong v. I.N.S.*, 805 F.2d 655, 662 (7th Cir. 1986); *see also Linnas*, 790 F.2d at 1032.

Accordingly, we find that Dailide's Fifth Amendment Equal Protection claim lacks merit.

### VII. Conclusion

For the foregoing reasons, we **AFFIRM** the order of summary judgment denying Dailide's collateral motions to the district court's previous order of summary judgment revoking his citizenship and cancelling his certificate of naturalization.

representative of the persons Dailide purports them to be. Second, even if the names do correspond to the same persons, Dailide has provided no evidence that these persons were not later executed, only that they were alive in 1942.

Accordingly, we find that the district court did not abuse its discretion when it granted summary judgment denying Dailide's motion for a new trial based on newly discovered evidence.

## VI. Equal Protection

Finally, Dailide claims that he was denied Equal Protection under the Fifth Amendment. He alleges he was treated differently than a similarly situated alien who might have entered the country at a different time. Specifically, Dailide hypothesizes that a former *Saugumas* candidate who entered the United States after 1952 would not be subject to the same denaturalization criteria because of the different definitions of "lawfully entered" that appear in the DPA and the INA.

He argues that a *Saugumas* member who entered after 1952, under the INA, cannot be denaturalized if he had obtained a visa through proper procedures, whereas, under our holding, Dailide can be denaturalized, even though he obtained his visa through proper procedures, because of his Nazi past.

Again, we need not discuss whether Dailide's interpretation of the INA is correct. Our analysis of his Equal Protection claim does not change either way.

Courts have long recognized that Congress may discriminate between classes of aliens. As long as there is no suspect class involved, Congress may treat classes of individuals differently if there is a rational basis for such classification. *See Hamama v. I.N.S.*, 78 F.3d 233, 237 (6th Cir. 1996). And Congress has sole discretion on admission, treatment, regulation, naturalization, and deportation of aliens. *See generally, Fiallo*, 430 U.S. 787. This power includes amending existing immigration laws to exclude

misrepresentations to the Army Counter Intelligence Corps (CIC) in obtaining his visa. *See United States v. Dailide*, 227 F.3d 385, 399 (6th Cir. 2000) (*Dailide II*) (Nelson, J., concurring) (indicating that although a majority of the panel held that Dailide's citizenship was "illegally procured," a majority did not agree that he had made misrepresentations). Dailide claims that without affirmance of this count, the denaturalization order is factually deficient because the Supreme Court has made misrepresentation a necessary prerequisite to a finding of "illegal procurement."

Third, he claims the district court abused its discretion in denying his motion for a new trial based on newly discovered evidence.

Finally, he argues that the revocation of his citizenship was in violation of the Equal Protection Clause of the Fifth Amendment to the Constitution because similarly situated Nazi persecutors would have been treated differently, and judged under the INA rather than the DPA, depending on when they entered the country.

We affirm the decision of the district court on all counts. First, through § 1451, Congress has expressly granted jurisdiction to the federal judiciary to substitute its judgment for that of the INS. In order to determine if citizenship was "illegally procured," it is necessary for the federal judiciary to re-examine an alien's criminal past to ascertain whether he was legally eligible for his visa at the time he received it. Furthermore, it is proper to apply the DPA to Dailide because it was in effect when he entered the country, even though it was abrogated before he was naturalized.

Second, a finding of misrepresentation is unnecessary for revocation of citizenship because § 1451 does not condition denaturalization on misrepresentation if the certificate of naturalization was otherwise "illegally procured."

Third, the district court did not abuse its discretion in denying Dailide's motion for a new trial because the motion was untimely and his newly discovered evidence could have

been discovered earlier through due diligence and would not have led to a different result.

Finally, Dailide's Equal Protection argument fails because Congress may distinguish among classes of aliens, and regardless, "former Nazi henchmen who entered the United States in 1950" is not a suspect class within the meaning of the Fifth Amendment.

## I.  Facts

Dailide was born in the independent nation of Lithuania in 1921.  He lived in the capital, Vilnius, and was enrolled in forestry school when the Soviet Union swept through the Baltics, and annexed Lithuania in 1940.  Subsequently, Dailide, as a nineteen year-old student, voiced his opposition to Josef Stalin and the Communist Party and was expelled from school.

The Soviets did not hold Lithuania long, for in the Summer of 1941, while Europe was in the midst of World War II, the Nazis invaded and the whole of the Baltics fell under their control. Aside from eliminating the Lithuanian government in August 1941, one of the Nazis' first acts in Lithuania was to reconstitute the *Saugumas*, the Lithuanian Security Police, which had been disbanded by the Soviets just prior to the Nazi invasion. The *Saugumas* was recommissioned to aid the Nazis in controlling the local population by performing searches and investigations and making arrests.

Dailide became a *Saugumas* desk clerk soon after its re-establishment.  Two months later, he became a *Saugumas* "police candidate."  This promotion coincided with Aleksandris Lileikis becoming chief of the Vilnius *Saugumas*. *See United States v. Lileikis*, 929 F. Supp. 31, 32-36 (D.Mass. 1996) (reviewing the role that the *Saugumas* and Lileikis played in the extermination of Lithuanian Jews).  Dailide was appointed to the *Komunistu-Zydu Sekcijas* (the "Communist-

suspected *Saugumas* members.  *See, e.g., Lileikis*, 929 F. Supp. at 33; *United States v. Ciurinskas* 976 F. Supp. 1167 (N.D. Ind. 1997); *United States v. Kungys*, 571 F. Supp. 1104 (D. N.J. 1983), *rev'd.*, 793 F.2d 516 (3rd Cir. 1986), *rev'd.*, 485 U.S. 759 (1988).  Here, Dailide's counsel is arguing only that he did not think of the idea of discrediting the report earlier, not that he could not have discredited the report earlier.  He was in possession of the report and easily could have hired the same or similarly qualified experts to review and discredit it.[9]  A new trial is therefore not warranted.

Moreover, even if the Stahlecker Report were discredited, there nonetheless exists an abundance of other evidence that inculpates the *Saugumas* as Nazi henchmen.  The idea that the *Saugumas* was substantially responsible for the extermination of the Jews of Vilnius is not in serious historical doubt, with or without the Stahlecker report.  *See, e.g., Lileikis*, 929 F. Supp. at 32-35. Interviews of witnesses, survivors, and *Saugumas* officials have all corroborated the *Saugumas* connection to the Nazi atrocities.  Moreover, there is physical evidence that the *Saugumas* was involved with the Nazis, such as the location of the *Saugumas* headquarters.  *See, e.g., Dailide I*, 953 F. Supp. at 197;  *Lileikis*, 929 F. Supp. at 34-35.

Dailide offers a second piece of evidence, the book *Vilnius Ghetto: Lists of Prisoners*, as newly discovered.  Dailide identifies fifteen names that appear on both a list of Jews arrested in 1941 and in the book, which lists Jews alive in 1942.  Dailide presents this as evidence that Jews allegedly killed by the *Saugumas* in fact never died.  However, the book existed in the public domain prior to the proceedings and could have been discovered earlier through due diligence.  Moreover, the discovery of this evidence would not have likely led to a different result.  First, the names on which Dailide relies are common Jewish names, not necessarily

[9]Dr. McGinness is counsel's brother.  Accordingly, it is likely that he was available to the defense to review the Stahlecker Report at an earlier time, had Dailide's counsel invited him to do so.

improbable that the two works were written by the same author. On its face, the Tiedemann Report is very thorough.

Notwithstanding, the Government's attorney asserted, at oral argument, that the Tiedemann report has itself been questioned by academicians. In many circles, Tiedemann is not highly regarded. Tiedemann is not merely the "German language expert" Dailide purports him to be. Tiedemann is a known historical revisionist, who has worked to discount the Holocaust as a hoax perpetrated by Jews to garner sympathy. Most notably, he has written claiming that the German massacre of Jews at a site called Babi Jar, near Kiev, Ukraine, was an elaborate lie perpetrated by Talmudic Jews. *See generally* Herbert Tiedemann, Babi Jar: Kritische Fragen und Anmerkungen, *in* ERNST GAUSS, GRUNDLAGEN ZUR ZEITGESCHICHTE (Grabert 1994). Such outrageous claims cast a shadow on any report written by Tiedemann concerning relations between Nazis and Jews during World War II. The questionable reliability of the Tiedemann Report further leads us to conclude that a new trial is not warranted because it is highly unlikely that the introduction of such a dubious account would have led to a different result for Dailide.

Dailide discovered this "evidence" after his original case was decided against him on summary judgment. While researching a similar revocation case, Dailide's counsel was presented with the idea that the Stahlecker Report may not be genuine. Accordingly, Dailide's counsel employed Dr. Frederick McGinness, a historian fluent in German, to review the document. McGinness found many linguistic mistakes inconsistent with the education and status that Stahlecker possessed. In turn, Dailide's counsel hired Dr. Tiedemann to examine the document.

However, through due diligence, Dailide's counsel could have discovered the report was questionable while researching Dailide's case. He could have easily employed the methods that he ultimately used. Furthermore, the Stahlecker Report is not a recently discovered artifact. It has been a prominent piece of evidence in previous trials of

Jews Section").[1] This section is believed responsible for the investigation and monitoring of communists and Jews in the area. Subsequently, he was transferred to the Information Section, where he claims his duties included gathering background information on potential employees to ensure they were not communists. Later, around the end of 1942, Dailide received a field assignment.

The *Saugumas* played a significant role in helping the Nazis exterminate the Lithuanian Jews. The *Saugumas* was placed under the control of the *Einsatzkommando 3*, led by Nazi Colonel Karl Jäger. Upon the Nazi invasion, the Vilnius Jews were arrested and herded into two ghettos. Many were sent to hard labor at Lukiski prison, then taken to Paneriai, a wooded area six miles away, and shot in groups of ten. By the end of 1941, 30,000 Vilnius Jews had been murdered. One ghetto was completely liquidated in 1941, and the other in 1943. By the end of the Nazi occupation in 1944, 55,000 Jews had been killed in Vilnius. Dailide claims he had no knowledge of any of these atrocities.

In 1944, as the tide of World War II was turning and the Allies were beginning to get a foothold in Nazi-occupied Europe, the Soviet Union marched into Lithuania and re-annexed the country. The Soviets held Lithuania as a Socialist Republic until its people gained independence on March 11, 1990. *See* Paul Quinn-Judge, *Lithuania Declares its Freedom from USSR*, BOSTON GLOBE, Mar. 12, 1990, at 1. Dailide, fearing repercussions from the Soviets, fled the Baltics in 1944, along with many other Nazi sympathizers. He established residence in Germany, where he met his wife, settled down, and lived until 1950.

In that year, he applied for emigration to the United States. Dailide's immigration process, like that of all aliens seeking entry in 1950, consisted of three steps. First, he had to qualify

---

[1]In his brief, Dailide steadfastly refers to this section as the "Communist Section," though historians agree that it was called the "Communist-Jews Section." *See Lileikis*, 929 F. Supp. at 34.

as a refugee with the International Refugee Organization (IRO). IRO Constitution, 62 Stat. 3037, 3051 (1948). Second, he had to receive a determination of displaced person status from the Displaced Persons Commission (DPC). Finally, he had to apply for and receive a visa from the United States Department of State. *Dailide II*, 227 F.3d at 401-02. Once lawfully admitted under a visa, he could apply for naturalization after five years.

There is no record of whether or when Dailide qualified as a refugee, but it is presumed he did. In order to receive displaced person status, Dailide was required to fill out a questionnaire from the CIC. The form inquired as to Dailide's activities during the war, to which he responded he had been a "practitioner forester." Further, the form inquired as to whether Dailide had ever been a member of a police service, to which he answered "no." Based on his form, Dailide received displaced person status. Dailide subsequently received his visa, without problem, from the Department of State. In 1955, he was naturalized and became a citizen of the United States. Upon his entry, he moved to Ohio and was living in Brecksville, outside of Cleveland, as of 1994.

## II.  Procedural Background

Upon the collapse of the Soviet Union, *Saugumas* records finally became available to INS and Office of Special Investigations (OSI) agents in 1993. Although agents had been aware for years of the role the *Saugumas* played in the extermination of the Vilnius Jews, *see, e.g.*, *United States v. Kungys*, 571 F. Supp. 1104 (D. N.J. 1983), *rev'd.*, 793 F.2d 516 (3rd Cir. 1986), *rev'd.*, 485 U.S. 759 (1988), this was the first opportunity to learn of the composition of its membership. Agents discovered that Dailide was listed as a *Saugumas* member, and in July of that year, interviewed Dailide in Cleveland.

On December 7, 1994, the Government initiated proceedings to revoke Dailide's citizenship based on his membership in the *Saugumas* and related activities during the

report, professed to be the work of Nazi Brigadeführer Dr. Walter Stahlecker, is a crude Soviet forgery.

In the original summary judgment order, and in our subsequent affirmance, the report of Dr. Stahlecker played a prominent role. *See Dailide II*, 227 F.3d at 392; *Dailide I*, 953 F. Supp. at 196 (indicating that the district court relied on the testimony of Dr. Yitzhak Arad, who has admitted that he had relied in part on the Stahlecker Report). The report was alleged to be the journal of the Brigadeführer, chronicling the march of the *Einsatzkommando 3* through the Baltics. It discussed the Nazis' capture and murder of many Jews. Most importantly here, it documented the camaraderie between the Nazis and the *Saugumas*, and illustrated how the *Saugumas* helped the Nazis exterminate the Jews of Vilnius.

Dr. Tiedemann concludes in his report that the Stahlecker Report is a fake. He points to the broken German used, indicating to him that the report was likely not written by a German or Austrian, but by a foreign forger, likely a Soviet.[7] Tiedemann further purports to illustrate that the writer of the Stahlecker Report was not familiar with the inner workings of the SS, since he often misapplies titles of officers, even misspelling the name of one of Stahlecker's commanding officers;[8] and supposedly displays an overall ignorance of the hierarchy. Furthermore, Tiedemann compares the Stahlecker Report with an earlier work of Stahlecker, demonstrating through sentence structure and vernacular that it is

---

[7] He believes it was a Soviet because the alleged forger used Russian colloquialisms translated into German.

[8] Three grades above Stahlecker was Generaloberst Hœpner. The report refers to him as Höppner. Tiedemann concludes that this is just one of many simple mistakes that the real Dr. Stahlecker would never have made. Furthermore, the writer of the report used territorial terms, such as "ostministerium" (department for the East), and military terms, such as "unterführer" (lower leader), which Tiedemann claims were never used by the Nazis.

a finding that Dailide was never "lawfully admitted" under the DPA because he had engaged in persecution is enough to allow us to find that his citizenship was "illegally procured."

Accordingly, we affirm the decision of the district court that a finding of misrepresentation is not a necessary prerequisite to a finding of "illegal procurement."

## V.   Newly Discovered Evidence

Dailide next claims that the district court erred in denying his motion for a new trial based on newly discovered evidence. We review such denials under an abuse of discretion standard. *United States v. Ross*, 245 F.3d 577, 584-85 (6th Cir. 2001); *United States v. Gaitan-Acevedo*, 148 F.3d 577, 589 (6th Cir. 1998).

Whether a new trial is warranted in the face of newly discovered evidence is a four-part inquiry. First, the evidence must have been discovered after trial. Second, the evidence must not have been discoverable earlier through due diligence. Third, the evidence must be of the nature that might have led to a different result. Finally, the evidence must be material, not merely cumulative. *Good v. Ohio Edison Co.*, 149 F.3d 413, 423 (6th Cir. 1998).

However, after disposition, a defendant is not permitted to infinitely burden the court with motions referencing supposedly new exculpatory evidence. A defendant must bring any new evidence before the court within one year after disposition. *See Feathers v. Chevron, U.S.A., Inc.*, 141 F.3d 264, 269 (6th Cir. 1998). Here, Dailide filed his motion for a new trial more than four years after the January 1997 order of summary judgment. Accordingly, Dailide's motion for a new trial was untimely.

Even if timely, Dailide's evidence would not have warranted a new trial. Dailide claims as newly discovered evidence the report of Dr. Herbert Tiedemann, in which Dr. Tiedemann, a native German speaker, states that an earlier

war. The Government filed a six-count complaint charging that Dailide had illegally procured his citizenship. The complaint sought revocation of his citizenship and cancellation of his certificate of naturalization.

The only relevant counts to this appeal are Counts I and IV. Count I charged Dailide with "assisting in persecution," in violation of the Constitution of the IRO, 62 Stat. 3037, 3051-52 (1948). Count IV charged Dailide with material misrepresentation, in violation of the DPA, 62 Stat. 1009, 1013 (1948), and of 8 U.S.C. § 1427.[2]

On January 29, 1997, the district court granted summary judgment for the Government on Counts I and IV, finding, in Count I, that the *Saugumas* had committed countless atrocities against the Jews, and that Dailide himself had persecuted Jews; and in Count IV, that Dailide made material misrepresentations when he lied to the CIC on his displaced person questionnaire, stating that he was a "practitioner forester" during the war, and that he had never been a member of a police force. *Dailide I*, 953 F. Supp. at 197-99.

---

[2] Section 1427 is the naturalization statute under which Dailide was granted citizenship in 1955. It required that all aliens first be "lawfully admitted" into the country. In its definition of "lawfully admitted," the DPA incorporated the definition of "refugees and displaced persons" from the Constitution of the IRO. *See* §2(b), 62 Stat. 1009. The IRO Constitution provided that the following persons would not be eligible for refugee or displaced persons status:

1. War criminals, quislings, and traitors.
2. Any other persons who can be shown:
a) to have assisted the enemy in persecuting civil populations of countries, Members of the United Nations; or
b) to have voluntarily assisted the enemy forces since the outbreak of the second world war in their operations against the United Nations.

Annex I, Part II, 62 Stat. 3051-3052. *See also Fedorenko*, 449 U.S. at 495 nn. 3-4. Extended, the legal theory is that if an alien was never eligible for displaced person status, he was never "lawfully admitted" and his visa is invalid. He therefore "illegally procured" his citizenship, since no alien can be legally naturalized without a valid visa.

Dailide appealed to this Court, and we affirmed the order of summary judgment on September 5, 2000. However, the Court only affirmed on Count I, holding no error in the district court's finding that Dailide persecuted the Jews of Vilnius. No majority of the Court affirmed the disposition of Count IV. Yet the result was affirmed, with a majority of the panel concluding that a finding of persecution was enough to indicate "illegal procurement" of Dailide's citizenship, and that revocation was proper. *See Dailide II*, 227 F.3d at 398-99 (Nelson, J., concurring).

Prior to June 8, 2001, Dailide filed seven post-trial motions in the district court, seeking collateral review. He claimed, *inter alia*, that the summary judgment order should be set aside and the case should be scheduled for trial. The Government moved for an order revoking Dailide's citizenship and directing the surrender of his certificate of naturalization.

The district court again granted summary judgment in favor of the Government on June 21, 2001, finding all of Dailide's claims either untimely or without merit. Furthermore, the court entered the order requested by the Government revoking Dailide's citizenship and ordering the surrender of his citizenship papers.[3]

Dailide filed his notice of appeal to this Court on July 23, 2001, reiterating the same claims he brought before the district court. Dailide's appeal is timely under Fed. R. App. P. 4(a)(1)(B), and he is again before this Court.

### III.  Jurisdiction

Fed. R. Civ. P. 60(b)(4) permits a collateral motion challenging a court's subject matter jurisdiction, but only if

[3] In the meantime, the INS held a deportation hearing in Florida (Dailide's subsequent residence) and has ordered him deported to Lithuania. *In the Matter of Dailide*, No. A07-412-330 (Imm. Ct., Bradenton, Fla., May 22, 2002).

denied his Ukranian heritage and claimed he was a farmer in Poland during the war.[5] *Id.*

However, *Fedorenko* is decided on its facts. The Court addressed Fedorenko's visa eligibility under § 10 of the DPA because his misrepresenations were the primary evidence that he had "illegally procured" his citizenship. The Court did not state, however, that it could not have affirmed the revocation under § 13, which makes "any person who is or has been a member of, or participated in, any movement which is or has been hostile to the United States or the form of government of the United States" visa ineligible, had the only evidence been Fedorenko's Nazi affiliation and persecution of Jews.[6] Accordingly, the Court could have reached the same result even if Fedorenko had filled out his form truthfully and obtained a visa, if it was later determined that he had participated in the atrocities of which he was accused.

Section 1451 makes no mention of a falsity requirement, but only requires an inquiry into whether citizenship was "illegally procured." Accordingly, through a plain reading of § 1451, coupled with the language in § 13 of the DPA making any Nazi ineligible for a visa, whether he lied on his application or not, we need not make a determination of whether Dailide made a material misrepresentation. Hence,

[5] Specifically, Fedorenko claimed, in response to a question, asking about his wartime activities (similar to that on Dailide's displaced person questionnaire), that he had spent that time as a farmer in Sarny, Poland. And then after being deported to Germany, he was forced to work in a factory in Poelitz until the end of the war, when he fled to Hamburg. *Fedorenko*, 449 U.S. at 496.

[6] Fedorenko served as a death camp guard at the Treblinka camp in Poland. However, as stated above, Fedorenko was not a German. He was a captured Soviet soldier forced to serve as a guard. He argued that his service at Treblinka was involuntary, and so, his activities there did not constitute "persecution" of the inmates there because he was forced to treat them cruelly. The Court rejected Fedorenko's argument and found that his conduct constituted "persecution" because he carried a gun and was permitted to leave the camp for short periods.

## IV.   Factual Sufficiency of the Order

Dailide next argues that the original summary judgment order cannot stand because no majority of this Court affirmed the finding of misrepresentation during his first appeal. Dailide claims that *Fedorenko* makes clear that a finding of misrepresentation is a necessary prerequisite to a finding that citizenship was "illegally procured."

In *Fedorenko*, the Supreme Court affirmed the revocation of a Ukranian death camp guard's citizenship. In doing so, the Court found that Fedorenko's citizenship had been illegally procured because he had never been "lawfully admitted" under § 1427 because his admission had been invalid under § 10 of the DPA, which declared that "any person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person" shall be inadmissible. 62 Stat. 1013; *Fedorenko*, 449 U.S. at 496. Specifically, Fedorenko

---

*denied*, 533 U.S. 931 (2001). The Seventh Circuit held as we do today.

Subject matter jurisdiction can be challenged at any time. *But cf. Ins. Corp. of Ireland, Ltd. v. Compagne des Bauxites de Guinee*, 456 U.S. 694, 702 n. 9 (1982) (stating that once a subject-matter jurisdiction claim is decided against a party, res judicata prevents him from re-litigating the issue). Dailide's failure to raise his meritless jurisdiction argument at his first appeal to this Court in 2000, though clearly cognizant of it as proved through his attorney's use of the defense in *Tittjung*, indicates to this Court that this present appeal was likely brought for the sole purpose of delaying Dailide's deportation until death. Moreover, the idea that Dailide's appeal is solely for delay purposes is furthered by the fact that three of his four arguments could have been brought in earlier proceedings, and are today untimely.

Dailide's attorney lost another similar denaturalization case, with an identical jurisdiction argument, in the Eighth Circuit. *See United States v. Negele*, 222 F.3d 443 (8th Cir. 2000), *cert. denied*, 531 U.S. 1153 (2001), but has yet to collaterally attack the judgment.

---

such lack of subject matter jurisdiction makes the judgment "void." However, we have held that such an attack is only cognizable if brought within a reasonable time. *See Manohar v. Massillon Cmty. Hosp.*, No. 99-3481, 2000 WL 302776 at *1 (6th Cir. March 17, 2000). On occasion, we have held a period of five years since judgment as too long. *See id.* We have also once held a period of three years too long. *See Ohio Cas. Ins. Co. v. Pulliam*, No. 96-6522, 1999 WL 455336 at *3 (6th Cir. June 23, 1999). Here, it had been approximately four years between the time the district court entered summary judgment in January 1997 and the filing of Dailide's collateral motion in December 2000. Although his appeal was pending before this Court in the interim, and his collateral attack was filed within months of the disposition of that appeal, there is no rule that would have prevented Dailide from filing his collateral motion while his appeal was pending. *See McDowell v. Dynamics Corp. of Am.*, 931 F.2d 380, 383 (6th Cir. 1991). Accordingly, we find that Dailide had not brought his Rule 60(b)(4) motion within a reasonable time after disposition, and his prayer for relief is untimely.

But regardless of whether Dailide brought his collateral motion within a reasonable time, his attack lacks merit, under de novo review. *See Jalapeño Property Mgmt., LLC v. Dukas*, 265 F.3d 506, 515 (6th Cir. 2001).

Under § 1451, the judiciary's role is limited to revocation of citizenship only if that citizenship was "illegally procured." The language of 8 U.S.C. § 1427 makes "lawful admission" a statutory prerequisite to the acquisition of citizenship. *See Fedorenko v. United States*, 449 U.S. 490, 515 (1981). The district court held that, although Dailide complied with all administrative procedures, he had never been "lawfully admitted" because he was statutorily ineligible to receive a visa in the first place under the DPA because of his Nazi past. However, Dailide claims that if an alien is granted citizenship through the legal framework set by the INS, citizenship was necessarily legally procured, regardless of whether he "slipped through the cracks" and should never have been admitted in the first instance. His argument equates to a

belief that the courts cannot review an alien's record to determine if he was legally eligible for admittance at the time he received his visa, but can only look to ensure that the alien conformed to the correct administrative procedures. He maintains that it is within the sole jurisdiction of the Executive branch to re-examine an alien's record to determine whether he was eligible for a visa in the first instance. *See* 8 U.S.C. § 1103(a); *City of New York v. Baker*, 878 F.2d 507, 512 (D.C. Cir. 1989) (indicating that the courts have no power to issue visas). In other words, he claims the court cannot substitute its judgment for that of the INS agent. So, in essence, Dailide's argument is that the district court unconstitutionally applied § 1451 and violated the separation of powers doctrine.

Dailide is correct that the courts only have power in regard to immigration as Congress allows. *See, e.g., Fiallo v. Bell*, 430 U.S. 787, 792 (1977); *see also Wong Wing v. United States*, 163 U.S. 228, 233 (1896). Dailide is also correct that, under statute, the federal judiciary is permitted only to make a determination of whether citizenship was "illegally procured." 8 U.S.C. § 1451. However, this determination necessarily requires an examination of the original visa process. Accordingly, § 1451 not only permits the federal judiciary to substitute its judgment, but *requires* it. When the consular officer or the INS was unaware of an alien's criminal past that predated his visa application, the judiciary is necessarily charged with reviewing the circumstances, and if the court finds that the alien was not legally entitled to a visa under the DPA when he received it, then the alien was never "lawfully admitted" under § 1427. Hence, citizenship was "illegally procured" under § 1451, and the court must substitute its judgment.

Dailide further challenges the federal courts' jurisdiction, maintaining that the DPA does not apply to him because it expired in 1952, three years before Dailide was naturalized. Dailide argues that if the DPA does not apply, reversal is mandated because it is the DPA's definition of "lawfully

admitted" that the district court relied on to determine that he had "illegally procured" his citizenship.

Dailide proposes that his case should be examined under the INA, which abrogated the DPA, and took effect in 1952. Under the INA, the definition of "lawfully admitted for permanent residence" was changed to include any and all persons who had been "lawfully accorded the privilege of residing permanently . . . as an immigrant in accordance with the immigration laws . . .." 8 U.S.C. § 1101(a)(20). Dailide reads this to mean that any person who received approval from the INS was "lawfully admitted," and therefore did not "illegally procure" his citizenship, regardless of any illegal acts the alien had performed in his homeland and failed to disclose to the INS.

Regardless of whether Dailide is correctly interpreting the INA as stripping the federal courts of jurisdiction to re-examine an alien's visa eligibility, he is wrong that the DPA does not apply to him. The DPA is applicable because it was the governing law in 1950, when Dailide arrived in the United States. The question of whether an alien was lawfully admitted is answered, not by the law at the time of naturalization, but by the law at the time of entry. *See Fedorenko*, 449 U.S. at 514-15 (referring to the statute "[a]t the time of petitioner's initial entry into this country"); *see also United States v. Demjanjuk*, 518 F. Supp. 1362, 1386 (N.D. Ohio), *aff'd*, 680 F.2d 32 (6th Cir. 1982) (per curiam) (applying DPA to alien who had entered in 1952 and been naturalized in 1958).

Accordingly, Dailide's attack on the subject-matter jurisdiction of the federal judiciary to determine that his citizenship was "illegally procured" because he had never been "lawfully admitted" was untimely and lacks merit. We therefore affirm the decision of the district court.[4]

---

[4] Dailide's attorney made the same jurisdictional and factual sufficiency arguments in a similar collateral proceeding in the Seventh Circuit. *See United States v. Tittjung*, 235 F.3d 330 (7th Cir. 2000), *cert.*