[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 16, 2005
THOMAS K. KAHN
CLERK

_____

No. 05-12238
Non-Argument Calendar

_____

Agency Nos. A95-551-340 and
A95-551-341

JAIME GUARNIZO MOSQUERA,
LYS STELLA LEONE LEONE,
JUAN SEBASTIAN GUARNIZO LEONE,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(November 16, 2005)

Before DUBINA, HULL and FAY, Circuit Judges.

PER CURIAM:

Jaime Guarnizo-Mosquera ("Guarnizo"), through counsel, petitions this Court for review of the Board of Immigration Appeals' ("BIA") order affirming the immigration judge's ("IJ") decision denying asylum and withholding of removal under the Immigration and Nationality Act ("INA"), and relief under the United Nations Convention on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").[1] Guarnizo argues on appeal that (1) the BIA and IJ erred in determining that no changed or extraordinary circumstances existed that warranted the consideration of Guarnizo's untimely application for asylum; (2) the IJ's adverse credibility determination was not supported by substantial evidence; and (3) the IJ's alternative determination, that is, that Guarnizo failed to establish that, if he was removed to Colombia, it is more likely than not that his life or freedom would be threatened due to his membership in a social group or his political opinion, also was not supported by substantial evidence. For the reasons set forth more fully below, we dismiss Guarnizo's petition as it relates to his asylum claim, and we deny it as it relates to withholding of removal.[2]

---

[1] Guarnizo has abandoned by not raising on appeal any challenges to the denial of his claim for relief under the CAT. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (holding that the petitioner abandoned the issue of the denial of relief under the CAT by not raising any challenges to it in her brief).

[2] Congress recently directed that all petitions for review will be governed under the permanent provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("the IIRIRA"). See REAL ID Act of 2005, Pub.L. No. 109-13, 119 Stat 231 (May 11, 2005) (providing that a petition for review "filed under former section 106(a) of the [INA] (as in effect before its repeal by section 306(b) of [the IIRIRA] shall be treated as if it had been filed as

On December 30, 1999, Guarnizo, a native and citizen of Colombia, entered the United States as a non-immigrant visitor for pleasure, with authorization to remain in the United States for a period not to exceed June 28, 2000. On May 28, 2002, Guarnizo, who had remained in the United States, filed an application for asylum and withholding of removal, asserting that, if he returned to Colombia, he would be persecuted by the Revolutionary Force of Colombia ("FARC"), a guerilla group, on account of his membership in a particular social group and his political opinion.[3] As part of his application, Guarnizo included that he was employed as Vice President of Credit with the Mortgage Bank of Ahorramas ("Ahorramas"), from January 1998 through May 1999, along with presenting a letter from Ahorramas verifying these dates. In an addendum to this application, however, Guarnizo stated that he worked at Ahorramas as General Controller from January 1997 through November 1997, and as Vice Present of Credit from May 1998 through May 1999.[4]

---

a petition for review under [INA § 242, 8 U.S.C. § 1252]").

[3] Guarnizo also included in his application for relief his wife, Lys Stella Leone Leone, and his minor son, J.S. Guarnizo Leone, who also had entered the United States for pleasure in July 17, 2000, and in November 13, 1999, respectively. References in this opinion to Guarnizo also will include his wife and son.

[4] As the IJ noted in his decision denying Guarnizo's application for relief from removal, when the IJ asked Guarnizo during a hearing on this application the dates when Guarnizo worked for Ahorramas, Guarnizo responded that (1) he did not work for Ahorramas from January 1997 through November 1997; (2) he, in fact, started working there in January 1998, as a General Controller; and (3) in May 1998, he became Vice President of Credit at Ahorramas.

In October 2002, the Immigration and Naturalization Service ("INS")[5] served Guarnizo, his wife, and his son with notices to appear ("NTAs"), charging them with removability, pursuant to INA § 237(a)(1)(B), 8 U.S.C. § 1101(a)(15), for remaining in the United States for a period longer than permitted. Guarnizo appeared before an IJ and, through counsel, admitted the facts contained in his NTA and conceded removability.

In October 2003, at a hearing on the petitioners' applications for asylum and withholding of removal, Guarnizo, who was the only witness, offered the following testimony. Guarnizo had degrees in statistics and finance and, prior to entering the United States, had been employed as a banker in Bogota, Colombia. From January 1995 through November 1997, Guarnizo worked at the government-owned Central Mortgage Bank, at which he was "in charge of the Colombian government's program for public housing." Guarnizo's specific job duties included "explain[ing] and defend[ing] the housing policies of the government," and working on "loan requests for credit."

---

When the IJ asked Guarnizo why he stated otherwise in his addendum to his application, Guarnizo, without explaining, again responded that he worked at Ahorramas from January 1998 through May 1999.

[5] On November 25, 2002, President Bush signed into law the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. This legislation created a new Department of Homeland Security, abolished the INS, and transferred its functions to the new department. Because this case was initiated while the INS still was in existence, this opinion refers to the agency as the INS.

In August 1997, while Guarnizo, a subordinate, and a manger of a construction company were inspecting a lot for future development in Bogota, a man on horseback approached Guarnizo, asked Guarnizo to speak with him alone, and then ordered Guarnizo to suspend his activities because the proposed development, which would be an "inconvenience" to the FARC, would (1) "close down a corridor of mobilization which was very important to them," and (2) "delay[] the worsening of the class struggle." After this man on horseback disappeared, Guarnizo terminated the meeting and returned to his office.[6] However, based on Guarnizo's belief that Colombian authorities had been infiltrated by the FARC, he did not mention this exchange to anyone other than his subordinate.

Guarnizo continued in this position with the Central Mortgage Bank until November 30, 1997, after which time he accepted a position with the privately owned Ahorramas, which also was located in Bogota, and which agreed to increase Guarnizo's yearly salary by two-million pesos. Moreover, in May 1999, Guarnizo received a telephone call from an unidentified man, who stated that Guarnizo had to leave Colombia within one week because Guarnizo (1) had ignored the FARC's warning in August 1997, and (2) was working with the Neighbor's Cooperative of

---

[6] Guarnizo conceded that he did not know whether the housing project at issue ever was built, and that he never had attempted to find out this information.

5

Mandalay ("Cooperative").[7] Guarnizo reported this call to the President of Ahorramas, and he quit the Cooperative, but he again did not notify any government authorities about the threat.

Also in May 1999, Guarnizo left his position with Ahorramas, based on (1) the May 1999, threat from the FARC, and (2) his deteriorating health.[8] Guarnizo then went into hiding with his family at his sister-in-law's house in Colombia, which was a 45-minute drive north of Bogota. Guarnizo stated that he could not relocate to another area of Colombia because only Bogota contained the types of jobs for which he was qualified and which related to his political beliefs. In addition, although Guarnizo's family had visas to enter the United States for pleasure in May 1999, they did not leave Colombia immediately because Guarnizo

---

[7] Guarnizo described the Cooperative as a "mutual benefit society," through which he would "inform the members in the whole issue of trying to obtain housing." Guarnizo also produced a letter from the General Treasurer of the Cooperative, verifying that Guarnizo and his wife were active members of the Cooperative from September 1996 through July 1999. When asked to explain why the letter stated that he left the Cooperative in July 1999, when Guarnizo had testified that he left it in May 1999, Guarnizo stated that "they liquidated whatever [the Guarnizos] had invested into the [C]ooperative[,] and [the Cooperative] g[ave] [the Guarnizos] the money," and that he continued to be a member under July 1999, without attending meetings.

[8] As corroborating evidence of his deteriorating health, Guarnizo produced (1) a note from Dr. Alfredo Brid, a practitioner in internal/pediatric medicine, which was dated August 2, 1999, stating that Guarnizo had been treated for stress "prior to the date December 1999"; and (2) an undated letter from Dr. Janet Moreno, a psychologist, stating that Guarnizo received psychological treatment from August to December 1999, and that he suffered intense anguish, stress, and psychosomatic disorders.

6

was hoping that things would "calm down," and because his minor son's school year did not end until November 1999.

In November 1999, Guarnizo's minor son entered the United States, and a friend registered his son for school. Guarnizo, in turn, entered the United States in December 1999, at which time he did not inform the immigration officer at the airport that he wished to apply for political asylum because he did not know this relief existed. Guarnizo subsequently obtained a driver's license through the help of a friend, along with a duplicate license in 2000, due to a change of address. Although he did not initially work, he later went to places where "they [would] come and pick up people to carry out any given activity." Moreover, in July 2000, after staying behind in Colombia to sell off "properties," Guarnizo's wife entered the United States.

In February 2002, Guarnizo's mother began receiving telephone calls, during which calls people were asking about Guarnizo's whereabouts. In March 2002, a man came to Guarnizo's mother's apartment and asked her where Guarnizo was staying, and in December 2002, the phone calls began again. Moreover, in June 2003, a member of the FARC went to the house where Guarnizo's mother had relocated, which was a three-and-a-half hour drive from Bogota, and told her to inform Guarnizo that the FARC was going to find him and "carry out the execution orders of the revolutionary tribunal." Guarnizo also produced two letters that his

mother had sent to him, containing information about the calls and threats and reflecting her full signature, including her Colombian citizenship number and a notary's seal.[9] When the IJ asked Guarnizo whether his mother typically sent him notarized letters, Guarnizo explained that he had asked his mother to have them notarized, based on advice he had received from the person aiding him in applying for asylum, so he could include the letters in his asylum application.

In addition to this testimony, the record contains the U.S. State Department's 2001 Country Report on Human Rights Practices for Colombia ("2001 Country Report"). The 2001 Country Report included that Colombia, which is a constitutional, multiparty democracy, generally has a poor human rights record. Internal security is maintained by both the armed forces and the national police. As a result of armed conflict between the government, paramilitary groups, leftist guerillas, including the FARC and the National Liberation Army ("ELN"), and narcotic traffickers, between 3,000 and 3,500 civilians were killed during 2001, including combat casualties, political murders, and forced disappearances. The FARC and the ELN, as well as the much smaller EPL and other groups, commanded an estimated total of 21,645 full-time guerillas, operated in more than 100 semi-

---

[9] These letters, which were dated April 8, 2002, and July 4, 2003, also included statements from Guarnizo's mother that Guarnizo's sister and brothers were doing well in Bogota. Moreover, Guarnizo testified that, since he had left Colombia, his sister and his in-laws had visited the United States and then returned to Colombia.

autonomous groups throughout Colombia, and undertook armed actions in nearly 1,000 of the Colombia's 1,097 municipalities. Moreover, throughout 2001, frequent road blockades, erected by paramilitary groups, the FARC, ELN, and peasant farmers, inhibited transportation, communication, and commerce, and they resulted in almost every major artery in the country being closed at some time.

Additionally, the record included the U.S. State Department's June 1997 Profile of Asylum Claims and Country Conditions for Colombia ("Profile"). This Profile similarly reflected that an estimated 10,000 to 15,000 full-time guerrillas had organized in over 100 groups and represented a "growing challenge to [g]overnment security forces," along with influencing more than half of the country's municipalities. Guerilla targets included those persons who (1) refused to submit to recruitment or extortion, and (2) were suspected of collaborating with authorities. This Profile, however, also included that Colombia is a large rugged country of more than a million square kilometers and 35.5 million people, violence generally was centered in a few provinces, and persons "fleeing guerillas or police/military harassment or threats in conflictive zones usually [were] able to find peaceful residence elsewhere in the country."

The IJ denied the petitioners' application for asylum and ordered them removed to Colombia. The IJ first determined that the government had established by "clear and convincing evidence" the removability of all three applicants, and that

9

Colombia had been designated as a country for removal for each of them. The IJ also explained that the petitioners were statutorily ineligible to receive asylum relief because their application was filed more than one year after they had arrived in the United States, and because they failed to show extraordinary or changed circumstances that excused this failure.[10]

The IJ, however, stated that she still had considered the petitioners' application for asylum, and she had concluded that the petitioners had failed to establish either past persecution, or a well-founded fear of future persecution in Colombia on account of a protected characteristic. The IJ specifically noted that she had not found Guarnizo to be credible because (1) Guarnizo had failed to tell Central Mortgage Bank officials that the FARC was opposing a planned housing project; (2) he had kept working for the Central Mortgage Bank until November 1997; (3) he had failed to inquire whether the planned housing project ever was built; (4) the FARC allegedly had not contacted Guarnizo again until May 1999; (5) the FARC had not contacted Guarnizo's mother until more than two years after Guarnizo had left Colombia; and (6) Guarnizo's testimony on the dates of his

---

[10] The IJ explained that she had not found credible Guarnizo's testimony that he did not know previously that asylum relief existed because Guarnizo (1) was an educated man who had held high-level positions in government and in private banking, (2) had obtained a Florida driver's license shortly after arriving in the United States, (3) had a duplicate license issued to him when he changed his address, (4) had his son enrolled in school, and (5) had found employment in the United States.

membership in the Cooperative and his dates of his employment with Ahorramas had not corresponded with his documentary evidence.

The IJ also stated that she had considered Guarnizo's evidence as to his membership in the Cooperative, but had concluded that the letter only verified that he was a member, not that he had withdrawn from the Cooperative due to any threats from the FARC, and that the letter contradicted Guarnizo's testimony as to when he withdrew his membership. Similarly, the IJ explained that the dates in Guarnizo's application had not matched his testimony, that is, Guarnizo had testified that he worked for Ahorramas from January 1998 through May 1999, while his application stated that he worked for Ahorramas from January 1997 through November 1997. The IJ noted as well that (1) Dr. Moreno's undated letter did not specify the cause of his psychological symptoms, and (2) Dr. Brid's note, although dated, referenced events subsequent to that date.

Regardless of this credibility determination, the IJ determined that Guarnizo's alleged meeting with a member of the FARC in August 1997, had not constituted persecution because it had not involved a threat, had not been reported to authorities by Guarnizo, and had not involved Guarnizo leaving his position with Central Mortgage Bank until several months after the fact. The IJ also found that the May 1999, telephone call that Guarnizo had received had not constituted "persecution." In addition, the IJ determined that Guarnizo had not shown that it was more likely

11

than not that his life or freedom would be threatened if he returned to Colombia because, as Guarnizo acknowledged at his asylum hearing, his sister and his wife's parents subsequently had come to the United States and then returned to Colombia, without being persecuted. The IJ, therefore, concluded that the petitioners were not eligible for asylum or withholding of removal.

Guarnizo appealed the IJ's decision to the BIA, arguing that the IJ erred in (1) concluding that Guarnizo was not persecuted based on his political opinion, and (2) not considering the extraordinary and exceptional circumstances that justified Guarnizo's later filing of his asylum application. The BIA summarily adopted and affirmed the IJ's decision. The BIA also added in explanation that it agreed with the IJ's finding that Guarnizo's application had not been filed within one year of his arrival in the United States, and that he had "failed to show an extraordinary or changed circumstance to excuse the failure to meet the filing deadline."

**Issue 1:** **Untimely Asylum Application**

Guarnizo concedes that we have held that we lack jurisdiction to review the decision of the Attorney General on whether a petitioner either complied with the one-year time limit for filing an asylum application, or established changed or extraordinary circumstances justifying an untimely filing. Nevertheless, he contends that "Colombians fleeing their homeland should be accorded wide latitude

12

in filing for asylum given the extraordinary circumstances . . . permeating all facets of Colombian life."

As Guarnizo has conceded, an alien may not apply for asylum "unless the alien demonstrates by clear and convincing evidence that the application has been filed within [one] year after the date of the alien's arrival in the United States." INA § 208(a)(2)(B), 8 U.S.C. § 1158(a)(2)(B). An untimely asylum application may be considered "if the alien can demonstrate to the satisfaction of the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum[,] or extraordinary circumstances relating to the delay in filing an application within the [one-year period]. INA § 208(a)(2)(D), 8 U.S.C. § 1158(a)(2)(D). However, "[n]o court shall have jurisdiction to review any determination of the Attorney General under [§ 1158(a)(2)]." 8 U.S.C. § 1158(a)(3); see also Fahim v. U.S. Att'y Gen., 278 F.3d 1216, 1217-18 (11th Cir. 2002) (holding that § 1158(a)(3) divests us of jurisdiction to review a decision regarding whether an alien complied with the one-year time limit or established either changed or extraordinary circumstances that would excuse his untimely filing). Moreover, although the REAL ID Act of 2005, amended the judicial review provisions of INA § 242(a)(2)(C), 8 U.S.C. § 1252(a)(2)(C), to allow review of constitutional claims and "questions of law," notwithstanding any other provision of the statute, see REAL ID Act of 2005, § 106(a)(1)(A)(iii), codified at 8 U.S.C.

13

§ 1252(a)(2)(D), we recently concluded that, because the timeliness of an asylum application is neither a constitutional claim nor a question of law, it is not covered by this amendment, see Charon-Botero v. U.S. Att'y Gen., No. 04-16422, manuscript op. at 6-8 (11th Cir. Oct. 6, 2005).

In the instant case, Guarnizo admitted that he arrived in the United States on December 30, 1999, and that he did not file his application for asylum until May 28, 2002. Because more than one year elapsed between Guarnizo's entering the United States and his filing of his application, we lack jurisdiction to review the determination that no extraordinary or changed circumstances excused Guarnizo's untimely filing. See 8 U.S.C. § 1158(a)(3). We, therefore, dismiss Guarnizo's petition to the extent he is seeking review of the denial of his asylum petition, and we review only the denial of his application for withholding of removal.

**Issue 2:** **Adverse credibility determination**

Guarnizo argues that the IJ abused her discretion in concluding that Guarnizo lacked credibility. Guarnizo contends that, although the IJ focused on the fact that Guarnizo's corroborating letters from his mother were notarized, this notarization was undertaken based on advice Guarnizo had received, and this process did not undermine the credibility of these sworn letters. Guarnizo argues that, to the extent the court found incredible his testimony that he did not immediately apply for asylum because he did not know about the availability of this relief, given the facts

14

that he was an educated man and had successfully obtained a driver's license, Guarnizo explained that he had obtained the license through "the help of friends." Guarnizo also summarily asserts that his testimony was "for the most part consistent with the documents provided as evidence," and that "any inconsistencies can be attributed to [his] lack of understanding of what was being asked."

When a single member of the BIA summarily affirms the IJ's decision without an opinion, such as here, the IJ's decision becomes the final removal order subject to review. Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1284 n.1 (11th Cir. 2003).[11] To the extent that the IJ's decision was based on a legal determination, our review is de novo. D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 817 (11th Cir. 2004). On the other hand, the IJ's factual determinations are reviewed under the substantial evidence test, and we "must affirm the [IJ's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Al Najjar, 257 F.3d at 1283-84 (11th Cir. 2001) (quotation and internal marks omitted).

---

[11] When the BIA adopts and affirms the IJ's decision with its own comments, we normally review both the BIA and the IJ's decision. See Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001) (explaining that "[i]nsofar as the [BIA] adopts the IJ's reasoning, [this Court] will review the IJ's decision as well"). In this appeal, however, the BIA's additional comments only related to the issue whether extraordinary or changed circumstances justified Guarnizo's late filing of his asylum application—a finding that we have no jurisdiction to review. Thus, our review of issues other than the timeliness of Guarnizo's asylum application is limited to the IJ's decision.

"We cannot engage in fact-finding on appeal, nor may we weigh evidence that was not previously considered below." Id. at 1278. Moreover, "[u]nder the substantial evidence test, we review the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc), cert. denied, 125 S.Ct. 2245 (2005). Thus, a finding of fact will be reversed "only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Id.

A credibility determination also is reviewed under the substantial evidence test; thus, we "may not substitute its judgment for that of the [IJ] with respect to credibility findings." D-Muhumed, 388 F.3d at 818. Indications of reliable testimony include consistency on direct examination, consistency with the written application, and the absence of embellishments. See In re B-, 21 I & N Dec. 66, 70 (BIA 1995); see also Dailide v. U.S. Att'y Gen., 387 F.3d 1335, 1343 (11th Cir. 2004) (affirming the BIA's adverse credibility determination, which was based upon its finding that the alien's testimony conflicted with his answers to interrogatories and other documentary evidence).

If credible, an alien's testimony may be sufficient, without corroboration, to sustain his burden of proof in establishing his eligibility for relief from removal.

16

Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005). "Conversely, an adverse credibility determination alone may be sufficient to support the denial of an asylum application." Id. However, "an adverse credibility determination does not alleviate the IJ's duty to consider other evidence produced by an asylum applicant." Id. If an applicant produces evidence beyond his own testimony, "it is not sufficient for the IJ to rely solely on an adverse credibility determination in those instances." Id. Furthermore, "the IJ must offer specific, cogent reasons for an adverse credibility finding." Id. "Once an adverse credibility finding is made, the burden is on the applicant alien to show that the IJ's credibility decision was not supported by 'specific, cogent reasons[,]' or was not based on substantial evidence." Id. (quotation omitted).

Here, the IJ offered "specific, cogent reasons" for its finding that Guarnizo's testimony was not credible. Moreover, the record reflects that, although Guarnizo testified that he did not seek asylum immediately because, at least in part, he did not know about it, he had advanced degrees and was employed in Bogota as a banker; he, through a friend, had his son enrolled in a school; he obtained both a driver's license and a duplicate driver's license; and he subsequently found employment. Although Guarnizo testified that a member of the FARC confronted him about a housing project in August 1997, and that this project related to his political beliefs,

17

he did not report this threat to either his employer or the Colombian authorities, and he did not subsequently inquire as of the development of the project.

Similarly, to the extent Guarnizo testified that, in May 1999, he received a phone call instructing him to leave Colombia due to his work on the housing project and his membership in the Cooperative, he also did not report this call to government authorities, and he did not explain why such a call would have been made two years after the August 1997 confrontation. Guarnizo testified that, although he and his family had visas to travel to the United States in May 1999, he did not arrive in the United States until December 1999, over six months after the fact, and he did not tell an immigration officer on his arrival that he was seeking asylum. Moreover, as the IJ noted, Guarnizo failed to explain why his testimony on his dates of employment with Ahorramas did not match the dates listed in his addendum to his application for relief from removal.

Examining Guarnizo's alleged corroborating evidence, Dr. Brid's note that Guarnizo had been treated for stress was pre-dated, and Dr. Moreno's letter, which was not dated at all, did not state that Guarnizo suffered intense anguish, stress, and psychosomatic disorders due to the alleged persecution. Although Guarnizo testified that he left the Cooperative in May 1999, immediately after the alleged threat, the letter from the General Treasurer of the Cooperative stated that Guarnizo

18

was a member until July 1999, and it did not include that he withdrew his membership based on any threats.

In addition, to the extent Guarnizo's mother sent him two letters, describing how members of the FARC in 2002 and 2003, had informed her that they intended to "execute" Guarnizo if he returned to Colombia, these alleged threats were made more than two years after Guarnizo had left Colombia, and Guarnizo admitted that he asked his mother to have the letters notarized so that he could include them in his asylum application. Moreover, the contents of these letters are questionable in light of the fact that, despite that both his sister and his in-laws subsequently had traveled to and from the United States, Guarnizo did not testify that they had been persecuted by members of the FARC. Thus, the IJ's reasons for her adverse credibility determination are supported by substantial evidence, and nothing in the record compels us to substitute our judgment for that of the IJ. See D-Muhumed, 388 F.3d at 818; see also Adefemi, 386 F.3d at 1027.

**Issue 3:** **Whether it is more likely than not that Guarnizo's life or freedom will be threatened in Colombia, due to his membership in a social group or his political opinion**

Guarnizo also argues that the IJ erred in denying him relief from removal when he provided both documentary and testimonial evidence showing that he suffered past persecution and had a well-founded fear of future persecution based on his political opinion and his refusal to stop participating in his "work for public

19

housing." Guarnizo contends that he established that past persecution was "on account of" his political opinion by testifying that a member of the FARC told him to stop his "work in public housing." Without citing to authority, Guarnizo asserts that his "work in public housing" posed a threat to the advancement of the FARC's cause of seeking a Marxist revolution by rendering the "less fortunate" persons in Colombia less "desperate" and susceptible to being "bought off." Again without citing to authority, Guarnizo also contends that he was persecuted not only based on his employment, but also due to his work at Ahorramas and in the Cooperative. Moreover, Guarnizo asserts that he showed that (1) his skills, experience, and convictions resulted in him being targeted by the FARC; and (2) the FARC has the resources to carry out its threats. Finally, Guarnizo contends for the first time on appeal that he cannot relocate safely to another part of Colombia because the guerilla problem is country-wide.[12]

As discussed above, an IJ's factual determinations are reviewed under the substantial evidence test, and we "must affirm the [IJ's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a

---

[12] In support of Guarnizo's last argument that the guerilla problem is "country-wide," he cites to evidence not in the record, that is, (1) the U.S. Department of States's 2002 Country Reports on Human Rights Practices in Colombia, which allegedly included that the FARC has obtained a "presence in virtually all of the nation's 32 departments and has a country-wide capability to harm"; and (2) an INS 2002 Resource Information Center ("RIC") Report, which allegedly includes, among other things, that the FARC has a "country-wide capacity to harm."

20

whole." See Al Najjar, 257 F.3d at 1283-84. An alien seeking withholding of removal under the INA must show that his "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." See INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A). In discussing the burden an alien carries in demonstrating that he "more-likely-than-not would be persecuted or tortured upon his return to the country in question," we have explained:

> If the alien establishes past persecution in his country based on a protected ground, it is presumed that his life or freedom would be threatened upon return to his country unless the INS shows by a preponderance of the evidence that, among other things, (1) the country's conditions have changed such that the applicant's life or freedom would no longer be threatened upon his removal; or (2) that the alien could avoid a future threat to his life or freedom by relocating to another part of the proposed country of removal, and it would be reasonable to expect him to do so. An alien who has not shown past persecution, though, may still be entitled to withholding of removal if he can demonstrate a future threat to his life or freedom on a protected ground in his country. An alien cannot demonstrate that he more-likely-than-not would be persecuted on a protected ground if the IJ finds that the alien could avoid a future threat by relocating to another part of his country.

Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003) (citations omitted). We also have explained that this burden of proof is "more stringent" than the standard for asylum relief. Sepulveda, 401 F.3d at 1232.

The statute governing withholding of removal protects not only against persecution by government forces, but also against persecution by non-

21

governmental groups that the government cannot control. Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 437 (11th Cir. 2004). However, "[p]ersecution on account of . . . political opinion . . . is persecution on account of the victim's political opinion, not the persecutor's." Id. at 437-38 (quoting INS v. Elias-Zacarias, 502 U.S. 478, 482, 112 S.Ct. 812, 816, 117 L.Ed.2d 38 (1992) (emphasis in original)). To qualify for withholding of removal based on persecution by a guerilla group on account of a political opinion, the petitioner must show that the guerillas persecuted him, or will seek to persecute him in the future, because of his actual or imputed political opinion. Sanchez, 392 F.3d at 438; see also Al Najjar, 257 F.3d at 1287 (the applicant must present "specific, detailed facts showing a good reason to fear that he will be singled out for persecution on account of such an opinion). Furthermore, although the INA does not define persecution, we have explained that "mere harassment does not amount to persecution," and that persecution it as "an extreme concept requiring more than a few isolated incidents of verbal harassment or intimidation." Sepulveda, 401 F.3d at 1231 (internal quotations and marks omitted).

In Sanchez, we examined a petitioner's challenge to the IJ's decision that the petitioner was not eligible for withholding of removal because the petitioner had not shown that the FARC's interest in her was related to a statutorily protected ground. See Sanchez, 392 F.3d at 436. In support of the petitioner's argument that this

22

decision was erroneous, she cited to her testimony that, after she refused to cooperate with the FARC, and because she was "not in agreement with the way [FARC had] destroyed the country," the FARC had demanded money from her, and, after she had left Colombia, had threatened her and another family member who had refused to cooperate. See id. We determined that the petitioner merely had showed that the FARC had harassed her due to her refusal to cooperate with them, and had failed to show actual or imputed political opinion, much less any connection between the petitioner's alleged political opinion and the FARC's alleged persecution. See id. at 438. We, therefore, concluded that the petitioner was not eligible for withholding of removal. See id.

Here, even accepting as true Guarnizo's testimony, he did not establish that he suffered past persecution based on either his political opinion, or his membership in the Cooperative. To the extent Guarnizo's appeal can be construed as asserting that his employment as a banker and his "work for public housing" constituted a "political opinion," he has failed to cite to authority for this argument. Indeed, although Guarnizo testified that he did not relocate to another city in Colombia because other cities lacked jobs that promoted his "political beliefs," he conceded that he did not ever inquire as whether the housing project at issue during his August 1997 confrontation with the FARC ever was completed. Moreover, similar to the harassment faced by the petitioner in Sanchez, neither the FARC's August 1997,

23

confrontation with Guarnizo, nor its threatening phone call in May 1999, rose to the level of persecution necessary to satisfy the showing for withholding of removal. See Sanchez, 392 F.3d at 438; see also Sepulveda, 401 F.3d at 1231 (holding that "menacing telephone calls and threats" did not rise to the level of past persecution).

Secondly, Guarnizo failed to demonstrate, in the alternative, a future threat to his life or freedom on a protected ground in his country, or that he could not avoid a threat by relocating to a different part of Colombia. Guarnizo testified that he no longer was a member of the Cooperative. Moreover, as discussed above, the IJ's finding as not credible evidence that the FARC had informed Guarnizo's mother that he would be "executed" if he were found, was supported by substantial evidence in the record. In addition, Guarnizo's claim that a future threat exists is belied in part by the fact that the record does not contain evidence showing that any other member of his remaining family in Colombia has been persecuted. Cf. Tawm v. Ashcroft, 363 F.3d 740, 743 (4th Cir. 2004) (concluding as persuasive authority that an alien did not establish a well-founded fear where, among other things, the alien's family continued to live in Lebanon without incident).

Finally, to the extent Guarnizo relies on a 2002 Country Report and a RIC Report in asserting for the first time on appeal that he could not avoid persecution by relocating, he has not attempted to supplement the record with these documents, and we "cannot find, or consider, facts not raised in the administrative forum." See

Forgue, 401 F.3d at 1286. Moreover, Guarnizo did not exhaust this argument by arguing it during his administrative proceedings. See Taylor v. United States, 396 F.3d 1322, 1327 (11th Cir. 2005) (holding that "[a] court may review a final order of removal only if 'the alien has exhausted all administrative remedies available to the alien as of right'" (quoting 8 U.S.C. § 1252(d)(1)); see also Fernandez-Bernal v. Attorney General, 257 F.3d 1304, 1317 n.13 (11th Cir. 2001) (interpreting this exhaustion requirement as jurisdictional).

Even if we had jurisdiction to review this argument, it is without merit. Although the 1997 Profile, which was made a part of the record, included that persons "fleeing guerillas or police/military harassment or threats in conflictive zones [in Colombia] usually [were] able to find peaceful residence elsewhere in the country," the 2001 Country Report, which also was in the record, included that the FARC and the ELN, as well as smaller groups, commanded an estimated total of 21,645 full-time guerillas, operated in more than 100 semi-autonomous groups throughout Colombia, and undertook armed actions in nearly 1,000 of the Colombia's 1,097 municipalities. This 2001 Country Report included, as well, that, throughout 2001, frequent road blockades erected by paramilitary groups, the FARC, ELN, and peasant farmers inhibited transportation, communication, and commerce, and resulted in almost every major artery in the country being close at some time. Additionally, the 1997 Profile similarly reflected that an estimated 10,

25

000 to 15,000 full-time guerrillas had organized in over 100 groups and represented a "growing challenge to [g]overnment security forces," along with influencing more than half of the country's municipalities.

However, during Guarnizo's evidentiary hearing, he testified that he personally cannot relocate within Colombia because other cities in Colombia do not have the same employment opportunities, not because other locations pose the same threat of harm based on his political opinion or membership in a social organization. Whether or not Guarnizo could relocate to another area where the FARC presence was non-existent or minimal, he failed to demonstrate that he would be singled out for persecution on account of a protected ground. See Sepulveda, 401 F.3d at 1232-33 & n.7 (affirming denial of asylum and withholding, despite that Country Reports reflected that the petitioner could not relocate to an area in Colombia where the ELN presence would be non-existent or minimal). Thus, the IJ's determination that Guarnizo failed to establish a well-founded fear of persecution on account of either his membership in the Cooperative, or his political opinion, is supported by substantial evidence; the record does not compel a contrary result. See Al Najjar, 257 F.3d at 1283-84.

Accordingly, we conclude that we lack jurisdiction to review the IJ's and the BIA's determination that there were no changed or extraordinary circumstances that warranted the consideration of Guarnizo's untimely application for asylum. In

addition, we conclude that substantial evidence supported the IJ's adverse credibility determination, along with the IJ's alternative determination that Guarnizo failed to establish well-founded fear of future persecution. We, therefore, dismiss Guarnizo's petition as it relates to his asylum claim and deny it as it relates to his request for withholding of removal.

**DISMISSED IN PART; DENIED IN PART.**