[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
October 18, 2004
**THOMAS  K. KAHN**
**CLERK**

_____

No. 03-15164

_____

Agency No. A07-412-330

ALGIMANTAS M. DAILIDE,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

**(October 18, 2004)**

Before TJOFLAT, DUBINA and PRYOR, Circuit Judges.

DUBINA, Circuit Judge:

Petitioner Algimantas M. Dailide petitions this court for review of the final order of removal of the Board of Immigration Appeals ("BIA"). The BIA's order affirmed the Immigration Judge's ("IJ") decision that directed Dailide's removal to Lithuania pursuant to the Immigration and Nationality Act of 1952 § 237(a)(4)(D), 8 U.S.C. § 1227(a)(4)(D). For the reasons that follow, we deny the petition for review.[1]

## I. BACKGROUND

Dailide was born in Kaunas, Lithuania in 1921. On June 22, 1941, Nazi Germany invaded Lithuania and reestablished the Lithuanian Security Police known as the *Saugumas*.[2] In June 1941 Dailide voluntarily joined the *Saugumas* in Vilnius, Lithuania. Dailide remained an active member of the *Saugumas* until 1944 when the *Saugumas* dissolved along with the Nazi regime.

---

[1] As a preliminary matter, we note that on November 24, 2003, this court denied Dailide's motion to stay the order of removal. In December 2003, Dailide fled the United States. The order of removal was never executed: the government never deported Dailide to Lithuania.

We *sua sponte* raised the issue of mootness and requested supplemental briefs. Upon further consideration, we are persuaded that the petition may be reviewed. The Immigration and Nationality Act does not expressly preclude review of Dailide's petition under the circumstances of this case, *see* 8 U.S.C. § 1252(b)(2), and the denial of Dailide's social security benefits is clearly a collateral consequence of the order of removal. The government concedes this in its brief and acknowledges that the petition may be reviewed.

[2] The *Saugumas* had disbanded prior to the German invasion.

In 1944 Dailide left Vilnius, Lithuania and fled to Germany, where he remained until 1949. On February 19, 1950, Dailide entered the United States as a non-quota immigrant under a visa issued pursuant to the Displaced Persons Act of 1948 ("DPA"). In order to obtain a DPA visa, an applicant had to qualify as a refugee within "the concern" of the International Refugee Organization ("IRO"), receive a determination of displaced-person status by the Displaced Persons Commission ("DPC"), and qualify for and receive a visa from the United States Department of State. *United States v. Dailide*, 227 F.3d 385, 388 (6th Cir. 2000) (*Dailide II*).

An "eligible displaced person" under section 2(c) of the DPA is defined in section 2(b) of the Act as, "any displaced person or refugee as defined in Annex I of the Constitution of the International Refugee Organization and who is the concern of the International Refugee Organization." The Constitution of the IRO, in turn, sets forth those who are, and those who are not, "the concern" of the IRO. Those who are not "the concern" of the IRO include, at Part II, section 2, of its Constitution, "[a]ny other persons who can be shown: (a) to have assisted the enemy in persecuting civilian populations of countries."

"After apparently qualifying as a refugee under the [Constitution of the] IRO, Dailide completed a personal history form prepared by the United States Army's Counter Intelligence Corps. ("CIC"), an organization which conducted investigations and interviews of applicants on behalf of the DPC." *Dailide*, 227 F.3d at 388. Based on the information that he provided to the CIC, Dailide received displaced person status and was granted a DPA visa. *Id.*[3] On February 3, 1955, Dailide applied for naturalization, and on September 6, 1955, the United States District Court for the Northern District of Ohio granted Dailide's application.

## A. *Denaturalization Proceedings*

On December 7, 1994, after *Saugumas* records became available to the Immigration and Naturalization Service, the government filed a complaint in the Northern District of Ohio, where Dailide resided, seeking to revoke Dailide's citizenship and cancel his certificate of naturalization pursuant to 8 U.S.C. § 1451(a). Under 8 U.S.C. § 1451(a), an individual's citizenship may be revoked

---

[3]     The personal history form asked Dailide for the "[e]xact description" of his activities during the war. Dailide stated that during 1942-44 he was employed as a "practitioner forester" in Vilnius, Lithuania. Moreover, the form asked whether the applicant had been involved in any police service membership, to which Dailide responded, "No." Dailide claims to have concealed his membership in the *Saugumas* for fear of repatriation to the Soviet Union.

*Dailide*, 227 F.3d at 388.

and the certificate of naturalization may be canceled if both were "illegally procured."[4]

Section 316 of the Immigration and Naturalization Act, 8 U.S.C. § 1427(a), requires that a naturalized citizen must have been "lawfully admitted" into the United States. Because Dailide entered the United States pursuant to the DPA, "the continuing validity of his citizenship and naturalized status must be judged by reference to the standards set forth at Part II, Section 2(a), of the IRO constitution." *United States v. Dailide*, 953 F. Supp. 192, 195 (N.D. Ohio 1997) (*Dailide I*). Thus, if Dailide "is found not to be the concern of the IRO by its terms, then he is not (and never was) an 'eligible displaced person' who was 'lawfully admitted' to this country, and his citizenship must be revoked under 8 U.S.C. § 1451(a) because it was 'illegally procured.'" *Id.*

In Count I of its complaint, the government alleged that Dailide's citizenship was illegally procured insofar as he was never the concern of the IRO because he assisted the enemy in the persecution of civil populations. The district

---

[4] Specifically, 8 U.S.C. § 1451(a) provides that:
It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any district court of the United States in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were illegally procured.

court granted the government's motion for summary judgment on Count I. *Id.* at 199.[5] The district court specifically found that Dailide "assisted in the persecution of civilian populations within the meaning of the IRO constitution, and was therefore ineligible for immigration to this country under section 2 of the DPA." *Id.* at 197. Accordingly, the district court held that "Dailide was not 'lawfully admitted' into the United States for purposes of naturalization under 8 U.S.C. § 1427(a), and that his citizenship and naturalization were 'illegally procured . . .' within the meaning of 8 U.S.C. § 1451(a)." *Id.* at 199.

In *Dailide I* the district court determined, based on documents presented by the government from the Lithuanian National Archives and the affidavit testimony of the government's expert, Dr. Yitzhak Arad, that the *Saugumas* assisted the Germans in "maintaining the control of the local populations of conquered nations," and that the *Saugumas* were responsible for the "enforcement of anti-Jewish laws such as curfews and confinement to ghettos, prohibitions against the use of public facilities and transportation, and requirements that Jews display visibly a yellow Star of David." *Id.* at 196. In addition, the district court

---

[5] The district court also granted the government's motion for summary judgment on Count IV, which alleged that Dailide made material misrepresentations during his immigration process. *Dailide*, 953 F. Supp. at 199. However, because the removal proceedings only involved the allegations in Count I, we need not concern ourselves with the allegations in Count IV.

considered specific atrocities committed by members of the *Saugumas*, and determined that Dailide's membership in the organization was sufficient to enter judgment for the government on Count I. *See id.* at 196-197.

The district court also considered, as "an alternate and independent basis for [its] holding that Dailide assisted in the persecution of civilian populations," specific acts committed by Dailide as a member of the *Saugumas*. *Id.* at 197. The court reviewed documentary evidence provided by the government as to two instances of persecution: Dailide's individual participation in the searches and arrests of "individuals of Jewish Nationality who were escaping from Vilnius," including the arrests of Izrael and Riva Soak; and Dailide's search of a Jewish prisoner, Mark Sapyro, which was detailed in a report signed by Dailide. *Id.*

Dailide appealed the district court's order, and on September 5, 2000, the Sixth Circuit affirmed. *Dailide*, 227 F.3d at 386.[6] In order to determine whether Dailide assisted the enemy in persecution, the Sixth Circuit considered "whether the *Saugumas* persecuted civil populations," and whether "Dailide assisted the *Saugumas* in the persecution." *Id.* at 391. The court also noted that "membership

---

[6] A review of the Sixth Circuit's *Dailide II* opinion reveals that although the court affirmed the district court's order, the panel majority only agreed on Count I, that Dailide persecuted the Jews of Vilnius, and did not reach a majority as to Count IV. *See United States v. Dailide*, 316 F.3d 611, 617 (6th Cir. 2003) (noting that "the Court only affirmed on Count I").

in an enemy group" would not be sufficient, without more, to constitute assistance in persecution. *Id.* at 390-391.

With respect to the role of the *Saugumas*, the *Dailide II* court determined that "the Germans created, staffed, and directed the *Saugumas*," *id.* at 391, and that the *Saugumas* were used to assist the *Einsatzkommando 3* – a mobile killing unit, which was responsible for the execution of all Jews in the Vilnius region – with searches, arrests, and investigations. *Id.* at 387, 391. Thus, the court concluded that "the *Saugumas* assisted the Nazi regime in persecuting the Jews in Lithuania, particularly during the time when Dailide was a member." *Id.* at 392. With respect to the role of Dailide, the court determined that Dailide "assisted the *Saugumas* in persecuting Jewish civilians" based on Dailide's role in the searches and arrests of Izrael and Riva Soak. *Id.* at 392-93; *Id.* at 399 (Nelson, J. concurring).

On June 21, 2001, the district court entered an order cancelling Dailide's certificate of naturalization, and revoking and setting aside its previous order, entered on September 6, 1955, which admitted Dailide to United States Citizenship. The court also directed Dailide to surrender his certificate of naturalization, United States passport, and any other documentation of United States citizenship. In addition, the district court also disposed of seven post-trial

8

collateral motions filed by Dailide. Dailide appealed the court's order, and on

January 15, 2003, the Sixth Circuit affirmed. *See United States v. Dailide*, 316

F.3d 611 (6th Cir. 2003) (*Dailide III*).

## B. *Removal Proceedings*

On July 10, 2001, the Director of the Office of Special Investigations for the

Criminal Division of the United States Department of Justice initiated removal

proceedings against Dailide by filing a Notice to Appear ("NTA") in the

Immigration Court. The government sought removal of Dailide from the United

States to Lithuania pursuant to 8 U.S.C. § 1227(a)(4)(D), which states that any

alien described in 8 U.S.C. § 1182(a)(3)(E) is deportable. Section 1182(a)(3)(E),

which is commonly referred to as the Holtzman Amendment, describes, "[a]ny

alien who, during the period beginning on March 23, 1933, and ending on May 8,

1945, under the direction of, or in association with . . . the Nazi government of

Germany . . . ordered, incited, assisted, or otherwise participated in the persecution

of any person because of race, religion, national origin, or political opinion is

inadmissible."

The NTA is framed in 11 paragraphs that set forth the government's

allegations against Dailide. On appeal in this court, Dailide specifically denies the

allegations in paragraphs 8 through 11. Paragraph 8 alleges that the *Saugumas*

assisted the Nazi forces in the persecution of Jews. Paragraph 9 alleges that in October 1941, as a member of the *Saugumas*, Dailide arrested Jews escaping from the ghettos, where they were forced to live, and held them for the German Security Police. Paragraph 10 alleges that in November 1941, as a member of the *Saugumas*, Dailide conducted a search of a Jewish prisoner and turned the prisoner's possessions over to the Germans. Paragraph 11 alleges that between June 1941 and July 1944 Dailide "ordered, incited, assisted, or otherwise participated in the persecution of persons because of race, religion, national origin, or political opinion under the direction of, or in association with the Nazi government of Germany."

On February 28, 2002, following a hearing, the IJ granted the government's request to apply the doctrines of collateral estoppel and *res judicata* to, *inter alia*, the factual allegations set forth in paragraphs 8 through 10 of the NTA. The IJ held that the doctrines were appropriate because "the specific factual findings in the NTA have been conclusively established in [Dailide's] denaturalization hearings." *Matter of Algimantas Dailide*, A07-412-330 (Immigration Court, May 22, 2002).

On May 22, 2002, following a hearing to determine whether Dailide was removable as charged in the NTA, the IJ held that he was. During the

10

proceedings, Dialide testified and proffered two experts, Dr. Frederick McGinness and Dr. Augustine Idzelis. In short, the IJ determined that Dailide's testimony was incredible; that each of the experts' testimonies could have been presented at the denaturalization proceedings; that Dr. McGinness's testimony did not affect the reliability of the government's evidence; and, that Dr. Idzelis lacked expert credentials and that his testimony was outrageous. The IJ then considered the government's evidence, which consisted of the record that had been established in the denaturalization proceedings, *Dailide I*, and *Dailide II*, and held that a factual basis exists for sustaining each of the allegations set forth in paragraphs 1 through 10 of the NTA.

The IJ reviewed the Holtzman Amendment and concluded that the term "persecution" includes the harms suffered by the Vilnius Jews – namely, unjust imprisonment at Lukiskes prison, confinement to inhabitable and disease infested ghettos, and execution because of their race, religion, and national origin. The IJ further considered the Holtzman Amendment's requirement that the government must show that Dailide "ordered, incited, assisted or otherwise participated in the persecution of *any person* because of race, religion, national origin, or political opinion." (Emphasis added). Based on Dialide's membership in the *Saugumas* and his documented participation in several specific acts of persecution

11

– namely, interviewing prisoners at Lukiskes prison, the arrest of Jews attempting to escape the ghettos in October 1941, and the search of "the Jew Mark Sapyro" in November 1941 – the IJ held that the Holtzman Amendment's requirements were satisfied, and thus that the facts in paragraph 11 of the NTA were established.

Dailide appealed the IJ's order of removal, and on October 7, 2003, upon an independent review of the record, the BIA entered an order dismissing his appeal. Dailide then perfected his petition for review of the BIA's decision in this court.[7]

## II. ISSUES

1. Whether the BIA erred in its determination that the Director of the Office of Special Investigations for the Criminal Division of the United States Department of Justice has the authority to issue a Notice to Appear.

2. Whether the doctrine of collateral estoppel was properly applied by the BIA to certain factual allegations in the Notice to Appear.[8]

---

[7] Dailide's removal proceedings were conducted in Bradenton, Florida. Thus, Dailide's petition for review was properly filed with this court under 8 U.S.C. § 1252(b)(2).

[8] Dailide also disputes the BIA's application of the doctrine of *res judicata*. This grievance, however, is meritless. Although the BIA noted that *res judicata* would apply to any potential claim that Dailide could have previously raised, it specifically stated that it was concerned with the application of collateral estoppel to issues raised in the denaturalization proceedings, not with claims that could have been raised in those proceedings. Thus, the BIA considered the applicability of collateral estoppel, not *res judicata*.

3. Whether the BIA's adverse credibility determinations against Dailide and his proffered experts were based on substantial evidence.

4. Whether the facts support the removal of Dailide under the Holtzman Amendment.

### III. STANDARD OF REVIEW

This court reviews the BIA's interpretation of applicable statutes *de novo*, but defers to the BIA's interpretation if it is reasonable. *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001); *see also Assa'ad v. United States Atty. Gen.*, 332 F.3d 1321, 1326 (11th Cir. 2003).

This court considers the legal question of whether the doctrine of collateral estoppel is available *de novo*. *Matter of McWhorter*, 887 F.2d 1564, 1566 (11th Cir. 1989). We review the decision to apply collateral estoppel for abuse of discretion. *Id.*

This court reviews the BIA's factual findings under the substantial evidence test. *Al Najjar*, 257 F.3d at 1283. We also review the BIA's credibility determinations under the substantial evidence test. *See Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002). Under this standard, the court must affirm the BIA's decision if it is supported by "reasonable, substantial, and probative evidence." *Al Najjar*, 257 F.3d at 284 (citations omitted). Indeed, the Immigration and

13

Nationality Act specifically provides that the "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

## IV. DISCUSSION

### A. *The NTA was Properly Issued*

The NTA was filed by the Director of the Office of Special Investigations ("OSI") for the Criminal Division of the United States Department of Justice. The Director of OSI does not appear on the list of officers named in 8 C.F.R. § 239.1(a) (2002), which provides that these officers, or officers acting in such capacity, may issue a NTA. Despite this, the BIA determined that the NTA was properly issued because the list was non-exclusive and because the Attorney General gave the Criminal Division the authority to handle such proceedings. The BIA's decision is correct.

The Attorney General is charged with the administration and enforcement of the Immigration and Nationality Act. 8 U.S.C. § 1103. In 1979, the Attorney General established the OSI within the Criminal Division and assigned to it the "primary responsibility for detecting, investigating, and where appropriate, taking legal action to deport . . . any individual who . . . had assisted the Nazis by persecuting any person." A.G. Order No. 851-79 (Sept. 4, 1979); *see also* 28

14

C.F.R. § 0.55(f) (2002). Thus, it is reasonable to conclude that despite its absence from 8 C.F.R. § 239.1(a) (2002), the Director of OSI has the authority to issue a NTA.

## B. *Collateral Estoppel was Properly Applied*

Collateral estoppel precludes a party from litigating an issue in a subsequent action if that issue was fully litigated in a previous action. *Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1359 (11th Cir. 1998); *Palciauskas v. United States*, 939 F.2d 963, 966 (11th Cir. 1991). In order for the doctrine to apply, the following criteria must be satisfied: (1) the issue at stake is identical to the one involved in the prior proceeding; (2) the determination of the issue in the prior litigation must have been "a critical and necessary part" of the judgment in the first action; (3) the issue was actually litigated in the prior proceeding; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding. *Pleming*, 142 F.3d at 1359.

For purposes of this petition, the issues at stake in the removal proceedings, with respect to the application of the doctrine of collateral estoppel, are the factual allegations set forth in paragraphs 8 through 10 of the NTA. Those factual issues include the assistance provided by the *Saugumas* to the Nazi forces in the

persecution of Jews and Dailide's specific acts of persecution as a member of the *Saugumas*. A plain reading of *Dailide I* and *Dailide II* reveals that these issues were the subject of Count I in the denaturalization proceedings.

Dailide contends that certain findings in the denaturalization proceedings were not a critical and necessary part of the judgment because the Constitution of the IRO, unlike the Holtzman Amendment, does not require proof that the activities occurred "because of race, religion, national origin, or political opinion" or "under the direction of, or in association with the Nazi government." This argument, however, is without merit.

The denaturalization proceedings required a finding that Dailide assisted the enemy in persecuting civilian populations. The removal proceedings required a finding that Dailide "ordered, incited, assisted, or otherwise participated in the persecution of persons because of race, religion, national origin, or political opinion under the direction of, or in association with the Nazi government of Germany." 8 U.S.C. § 1182(a)(3)(E). In order to reach the conclusion that Dailide assisted the enemy in persecuting civilian populations, the courts in *Dailide I* and *Dailide II* were required to determine, as a critical and necessary part of their judgments, the precise relationship between the *Saugumas* and the Nazi forces; the activities of the *Saugumas*; and Dailide's activities as a member of the

16

*Saugumas*, including his direct participation in the persecution of civilians. In their consideration of these issues, the courts found that the *Saugumas*, *inter alia*, enforced anti-Jewish laws, and arrested, searched, and detained Jewish civilians; that the *Saugumas* carried out these activities at the direction of, and to provide assistance to, the Nazi forces in their persecution of the civilian population of Vilnius Jews; that as a uniformed member of the *Saugumas*, Dailide participated in the arrest of individuals of Jewish Nationality who were attempting to escape from their confinement to the ghettos of Vilnius.

It is clear that these issues were actually litigated in the denaturalization proceedings, and that Dailide's arguments to the contrary are without merit. Moreover, although Dailide contends that he was denied a full and fair opportunity to litigate these issues at the denaturalization proceedings, there is nothing in the record to support this contention.

In its determination that the doctrine of collateral estoppel was applicable, the BIA conducted this same analysis and reached these same conclusions. Thus, the BIA's decision as to its applicability was correct. Further, upon a review of the denaturalization and removal proceedings, it is clear that the BIA did not abuse its discretion in applying the doctrine of collateral estoppel to the finding that

17

Dailide arrested Jews escaping from the ghettos, where they were forced to live, and held them for the German Security Police.

More importantly, the BIA conducted an independent review of the evidence – including the documents presented by the government from the Lithuanian National Archives and the sworn statements of Dr. Arad, along with the testimony of Dr. McGinness, Dr. Idzelis, and Dailide – and concluded that clear and convincing evidence supports the IJ's factual and legal conclusions "whether or not we collaterally estop [Dailide] from offering new challenges – if only because the new 'facts' he has attempted to introduce are either irrelevant, unpersuasive, or incredible." *Matter of Algimantas Dailide*, A07-412-330 (BIA, Oct. 7, 2003). Thus, Dailide's attack on the BIA's application of the doctrine of collateral estoppel also fails because the BIA made findings, which were sufficient for removal, independent of the doctrine of collateral estoppel.

C. *The Credibility Determinations Were Correct*

The BIA agreed with the IJ's credibility findings as to Dailide, Dr. McGinness, and Dr. Idzelis. The BIA determined that Dailide's testimony as to his membership in the *Saugumas* was not credible because it conflicted with his previous answers to interrogatories, conflicted with his affidavit and deposition testimony, conflicted with the *Saugumas* records, and was evasive and misleading.

18

The BIA also determined that Dr. McGinness and Dr. Idzelis's testimony, which was proffered to rebut the government's expert, could have been presented at the denaturalization hearing. Alternatively, the BIA found that Dr. McGinness, who is the brother of Dailide's counsel, lacked expert credentials in European history during World War II, and that, in any event, the testimony "did not provide an informed or useful critique of Dr. Arad's factual determinations." The BIA found that Dr. Idzelis also lacked expert credentials because he had "no relevant published works on the Holocaust and has not even had any course work that would provide a reasonable basis for his opinions." *Id.* The BIA further reviewed Dr. Idzelis's testimony and found that his "reliability as a witness was also considerably undermined when he testified that a 'mass killing' was not defined by the number of people killed but rather the number of killers involved." *Id.*

The BIA's credibility findings as to these witness was clearly based on reasonable, substantial, and probative evidence. We cannot say that any reasonable adjudicator would be compelled to conclude to the contrary. 8 U.S.C. § 1252(b)(4)(B).

## D. *The Facts Support Removal*

Dailide's contention that the facts do not support his removal under the Holtzman Amendment is baseless. The BIA's determination that the facts support

19

a finding that Dailide "ordered, incited, assisted or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion under the direction of, or in association with the Nazi government of Germany" is clearly supported by the record.

The BIA determined that the Vilnius Jews suffered persecution by the *Saugumas* at the direction of, or in association with, the Nazi forces; that Dailde was a voluntary member of the *Saugumas* between June 1941 and July 1944; and that as a member of the *Saugumas*, Dailide participated in several specific acts of persecution – namely, interviewing prisoners at Lukiskes prison, the arrest of Jews attempting to escape the ghettos in October 1941, and the search of "the Jew Mark Sapyro" in November 1941.

Moreover, Dailide's argument that the removal order should be reversed because the Holtzman Amendment requires some participation in the persecution of any person that goes beyond assistance is without merit for at least two reasons. First, the facts reveal Dailide's personal and direct involvement in the persecution of Jews, which clearly goes beyond assistance. *See, e.g., Negele v. Ashcroft*, 368 F.3d 981, 983-984 (8th Cir. 2004) (holding that by guarding the perimeter of German labor camps to ensure that prisoners did not escape, the petitioner was actively and personally involved in persecution, and, therefore, subject to removal

20

under the Holtzman Amendment). Second, a plain reading of the Holtzman Amendment reveals that an individual's assistance, or some other form of participation in the persecution of any person, would be sufficient. *E.g.*, *Hammer v. I.N.S.*, 195 F.3d 836, 843-844 (6th Cir. 1999) (stating that because the Holtzman Amendment authorizes deportation for anyone who "assisted" or "otherwise participated" in persecution, the government need not present evidence of personal involvement in specific atrocities).

## V. CONCLUSION

For the foregoing reasons, we deny Dailide's petition for review.

**PETITION DENIED.**