[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 30, 2005
THOMAS  K. KAHN
CLERK

No. 05-11889
Non-Argument Calendar

_____

Agency No. A79-417-097

ALI HASSAN JASEM,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(November 30, 2005)**

Before TJOFLAT, CARNES and FAY, Circuit Judges.

PER CURIAM:

Ali Hassan Jasem, through counsel, petitions this Court for review of the Board of Immigration Appeals' ("BIA's") final order affirming the immigration judge's ("IJ's") decision, denying Jasem's claims for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), and for withholding of removal under the United Nations Convention on Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"). In his appeal brief, Jasem moves this Court to remand his case to the BIA for consideration, or to take judicial notice, of evidence allegedly proving changes in country conditions in Iraq since the BIA issued its removal order. Jasem also argues that substantial evidence did not support (1) the IJ's adverse credibility determination; (2) the IJ's and the BIA's determination that humanitarian asylum was not warranted, pursuant to 8 C.F.R. § 1208.13(b)(1)(iii); and (3) the IJ's and the BIA's conclusions that Jasem was not statutorily eligible for withholding of removal under the CAT. For the reasons set forth more fully below, we deny Jasem's motion to remand or to take judicial notice of new evidence, and we deny his petition for review.

On September 7, 2001, Jasem, a native and citizen of Iraq, illegally entered the United States and was detained. The Immigration and Naturalization Service ("INS")[1] subsequently served Jasem with a notice to appear ("NTA"), charging

[1] On November 25, 2002, President Bush signed into law the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. This legislation created a new Department of Homeland Security, abolished the INS, and transferred its functions to the new department.

him with removability, pursuant to INA § 212(a)(7)(A)(i)(I), 8 U.S.C.

§ 1182(a)(7)(A)(i)(I), for entering the United States without proper documentation.

In November 2001, during a preliminary hearing before an IJ, Jasem admitted the

facts contained in his NTA and conceded removability.

In December 2001, Jasem filed a counseled application for asylum and for

withholding of removal under the INA and the CAT. Jasem asserted in his

application that, if he returned to Iraq, he would be persecuted by the government

on account of his religious affiliations and political opinions imputed to him as a

Shiite Muslim, and as the "first next person old enough for questioning" about his

brother's disappearance.

On September 24, 2003, at a hearing on Jasem's application for relief from

removal, Jasem, who was the sole witness, offered the following testimony. Jasem

was 41 years' old, was born in Baghdad, Iraq, and was a Shiite Muslin. Jasem had

a sister who lived in the United States, and a wife, son, mother, four sisters, and an

older brother, Kazim, who lived in Baghdad. Jasem's oldest brother, Falah, had

disappeared in November 1981, during Iraq's war with Iran.[2]

---

Because this case was initiated while the INS still was in existence, this memorandum refers to
the agency as the INS.

    [2] As the IJ noted in his decision denying relief, although Jasem testified that he was born
in 1962, his brother Kazim was born in 1955, and his brother Falah was born in 1953, Jasem also
testified that "[m]y older brother's name is Falah Hassan Jasem. And my youngest brother's
name is Kazim Hassan Jasem." Additionally, as discussed above, Jasem included in his
application, in explaining why officials questioned him about Falah's disappearance, that Jasem

3

Jasem further testified that, in July 1991, officials with General Intelligence, a government agency, had come to his home and questioned him for approximately an hour and a half about his brother Falah, whom the officials believed had defected from the Iraq army in 1981, and had joined a group that was loyal to the Iranians. After Jasem denied having had any contact with Falah since his disappearance, the officials left, but stated that they would return. In September 1991, the "same people" returned to Jasem's home, made similar inquiries about Falah, and explained that they had stopped paying Falah's salary to Falah's wife because the officials believed that Falah was a traitor to Iraq.

Between September 1991 and December 2000, when Jasem left Iraq, government officials visited him approximately 15 times, each time attempting to get him to reveal information about Falah or Falah's whereabouts. In July 1995, during one of these visits, government officials came to Jasem's home and escorted him blindfolded in a vehicle to an eight-by-five-foot "red room," which had a cupboard and a bathroom. The officials left Jasem in the "red room" overnight, after which time they took him to another room and interrogated him. During this interrogation, which lasted approximately an hour, an officer (1) again asked Jasem

---

"was the first next person old enough for questioning (my brother's son is not old enough)." When the IJ questioned Jasem about this apparent inconsistency, Jasem stated that the government officials had questioned him, rather than his older brother Kazim, because Kazim was partially deaf and illiterate.

4

about Falah, and (2) stated that Jasem was a Shiite who "belong[ed] to Iran."

Moreover, in February 1996, government officials drove Jasem blindfolded to

another location to be interrogated. After Jasem again stated that he had no

information, he was detained overnight and then told that he needed to bring

information in the future.[3]

In addition to stating generally that these officials visited him twice in 1997

and three times in 1998, Jasem testified that, in January 2000, the officials took

him to an office, at which Jasem was interrogated by an official whom Jasem

believed was high ranking in the Iraqi government. After Jasem informed this

official that he had no information, the official told Jasem that the government had

a new method that it intended to use on him to get him to cooperate. This official

then instructed another person to take Jasem to "the place with the snakes." Jasem

was taken to a glass-walled room that had a snake lying in one corner.

During the two to three hours that Jasem was left in the room with the snake,

he called the guard to take him to use the restroom. When the guard eventually

responded, the snake was in front of Jasem and the guard told Jasem he had to

---

[3] In addition to this information, Jasem stated during cross-examination that, during the 1996 detention, government officials hit him in the eye and in the back, cut his lip, pushed him, and kicked him. Jasem, however, also clarified that government officials did not beat him during any other visit.

wait. The guard later took Jasem to the "red room," where Jasem spent the night before being taken to the official for another interrogation.[4]

In November 2000, the last time the government officials visited Jasem, they took him to a new office and, this time, advised him in a threatening manner that, if he did not cooperate, the officials were going to turn his case over to a "special court." The officials then took Jasem to the "red room," where he stayed for seven days before the officials took him back to an office for additional interrogation. When Jasem arrived at the office, the official injected Jasem with an unknown substance to "relax" him. When Jasem stated that he knew nothing about Falah, the official yelled at him, called him names, and again told him that, if he did not give them information within the next month, they would take him to a "special court." Jasem stated that he believed that this "special court" meant a court where he would have no rights, and the government either would order him killed or jailed. Thus, in December 2000, after Jasem was released, he left Iraq.

Jasem further stated that, after he left Iraq, his family sent him letters warning him that government officials had continued looking for him and had brought to Jasem's home a police order, directing him to appear at the Intelligence Agency Center. One of Jasem's sisters also informed him in a letter that the

---

[4] As the IJ noted in his decision denying relief from removal, Jasem did not mention this incident either during his initial interview with an immigration officer, as part of his credible fear interview, or in his application for relief.

6

officials had confiscated a medical center that he had operated for 12 years and had burned his vehicle.[5] Moreover, when Jasem's family attempted to report this burning, the police informed them that only the owner of the vehicle could make a report. Jasem also testified that, despite the change in regime in Iraq between his departure and the evidentiary hearing, and despite the fact that the government officials who had persecuted him no longer were part of the government, he believed that he would be subject to reprisals by these persons because he previously had refused to cooperate with them.[6]

The record also contained the U.S. State Department's 2002 Country Reports on Human Rights Practices for Iraq ("2002 Country Reports"). This document included that, in 2002, although Iraq claimed to be a democratic republic, political power rested exclusively in "a harshly repressive one-party

---

[5] In support of Jasem's application, he also filed copies of (1) the summons, directing him to appear at the Intelligence Center; and (2) transcribed letters from his sisters.

[6] In addition to Jasem's testimony, on the day of the hearing, he introduced into evidence (1) a letter from a special agent with the U.S. Department of Homeland Security, confirming that Jasem cooperated in providing assistance to the government in an international alien smuggling case; (2) a September 2003 news article relating that, based on decisions adopted by the United States High Commissioner for Refugees ("UNHCR"), following the explosion of the United Nations' office in Baghdad, repatriation of Iraqi nationals living in Iran would not be pursued; (3) a September 2003 article from the Miami Herald, involving interviews with leaders of guerillas cells in Iraq who were devoted to fighting the presence of the United States in Iraq; and (4) the UNHCR's (i) June 2003 appeal for aid from the United States to meet humanitarian needs in Iraq, (ii) July 2003 warning for countries not to return refugees to Iraq, and (iii) August 2003 recommendation that countries maintain a ban on forced returns of persons to Iraq, including rejected asylum seekers, because potential persecution might emanate from non-state agents. Moreover, In May 2003, prior to the hearing, Jasem filed 24 articles and reports, documenting abuses that occurred during the reign of Saddam Hussein's regime.

7

apparatus dominated by Saddam Hussein al-Tikriti and members of his extended family," and Iraq's human rights record remained extremely poor. Under Saddam Hussein's regime, the government summarily executed alleged political opponents and leaders of the Shiite religious community, along with persons who merely were associated with opposition groups. The government also was responsible for disappearances and torturing persons suspected of, or related to persons suspected of, among other things, opposition politics, economic crimes, and military desertion. Although Iraq's Constitution and legal code explicitly prohibited arbitrary arrests and detentions, the authorities routinely engaged in these activities, along with denying detainees access to lawyers and fair public trials.

The government, however, introduced three articles from the Miami Herald, dated September 22 and 23, 2003, which included the following headlines: "Iraq's governing council takes U.N. seat," "Bush rejects call for quick Iraq handover," and "Iraq will be democratic, two leaders say." These articles discussed the changed political climate in Iraq following the fall of Saddam Hussein's regime in March 2003. Moreover, the IJ stated that he "would be taking administrative notice of changes that ha[d] occurred in the country of Iraq, because they were of such a notable degree."

At the conclusion of this hearing, the IJ issued an oral decision, denying Jasem's application for asylum and withholding of removal under the INA and

8

CAT, and ordering him removed to Iraq. After summarizing the evidence in the record, the IJ determined that, although Jasem's testimony, if true, established past persecution, his testimony lacked credibility. In reaching this adverse credibility determination, the IJ cited to (1) inconsistencies between Jasem's testimony and his application on the ages of his brothers and the reason why Jasem was contacted about Falah's disappearance; (2) Jasem's failure to state earlier all the facts to which he testified during his removal hearing, including that he was placed in a cell with a snake; and (3) inconsistencies in the record relating to Jasem's testimony that he was detained and beaten in 1995.

Alternatively, the IJ determined that, even if the IJ were to consider Jasem's testimony as credible, asylum was not warranted because a fundamental change in the country conditions had occurred, and Jasem had no well-founded fear of future persecution upon his return to Iraq. The IJ specifically noted that, in light of the end of Saddam Hussein's regime—the regime under which Jasem had resided before he entered the United States—a fundamental change in the country's conditions had occurred. The IJ also noted that, although "chaos" and "armed strife" remained in Iraq, the evidence in the record showed that, through military force, monies, and other assistance, Iraq was becoming a democratic country, free from the abuses described in the 2002 Country Reports. The IJ discussed that, due to these changed country conditions, Jasem also was not eligible for withholding of

9

removal under the INA and the CAT. In addition, the IJ clarified that, although it understood that it could grant humanitarian asylum based on past persecution alone, the record did not reflect that Jasem would face problems on his return to Iraq, other than those associated with earning a livelihood.

Jasem appealed the IJ's decision to the BIA. In a supporting brief, Jasem argued that the IJ's decision denying him asylum and withholding of removal under the INA and the CAT should be reversed because the IJ erred in (1) making an adverse credibility finding based on alleged inconsistencies and omissions in the record that either did not exist or were not central to Jasem's claims; (2) finding changed circumstances sufficient to rebut a presumption of a well-founded fear; and (3) failing to consider that, even if changed country conditions existed, a grant of asylum was warranted for humanitarian reasons.

In March 2005, the BIA affirmed and adopted without opinion the IJ's decision as to the IJ's adverse credibility determination. The BIA, however, also added that, even if Jasem had been credible, there had been a fundamental change in circumstances in Iraq, such that Jasem did not have a well-founded fear of persecution based on his original claims for asylum and withholding of removal. The BIA explained that it was taking administrative notice of the fact that Saddam Hussein's regime in Iraq had been replaced, the Ba'ath Party no longer was in power, and Iraq, which subsequently was being governed by a Governing Council,

10

was made up of different religions and political parties, with different agendas, and, therefore, represented all sections of Iraqi society. The BIA also stated that, although it recognized that the situation in Iraq was unstable, and that Ba'ath Party loyalists were still physically present in Iraq, the basis of Jasem's claims for relief was from the Ba'ath Party itself, and he could avoid these loyalists by relocating to another part of Iraq. Jasem then filed this timely petition for review.

As a preliminary matter, as part of his brief on appeal, Jasem moves us to take judicial notice of political developments in Iraq that have occurred since the BIA issued its order affirming the IJ's decision in March 2005. Jasem also attaches for our review four newspaper articles, which he contends show ongoing "gross, flagrant and mass violations of human rights in Iraq."

Before the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104-208, 110 Stat. 3009-546, we utilized 28 U.S.C. § 2347(c) to invoke our discretionary authority to remand immigration cases, such that new non-record evidence could be admitted on appeal, or cases could be remanded for the BIA or the IJ to consider this evidence in the first instance. See Al Najjar v. Ashcroft, 257 F.3d 1262, 1278 (11th Cir. 2001). The IIRIRA, however, expressly prohibits a court reviewing a BIA removal order from remanding a case for the consideration of additional evidence. See INA 242(a)(1), 8 U.S.C. § 1252(a)(1). Moreover, the IIRIRA provides that "the court

11

of appeals shall decide the petition only on the administrative record on which the order of removal is based." INA § 242(b)(4)(A), 8 U.S.C. § 1252(b)(4)(A). Thus, we have concluded that we "cannot find, or consider, facts not raised in the administrative forum." Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005); see also Al Najjar, 257 F.3d at 1278 (holding in a transitional rules case that we "cannot engage in fact-finding on appeal, nor may we weigh evidence that was not previously considered below"). Accordingly, to the extent Jasem is moving us to remand his case to the IJ or the BIA, or to consider new evidence of changed country conditions, we are foreclosed from granting this relief.

**Issue 1:**      **The IJ's adverse credibility determination**

Jasem argues that the IJ's adverse credibility determination must be overturned because none of the IJ's factual determinations is supported by substantial evidence, and, even if substantial evidence existed, the alleged inconsistencies on which the IJ relied either were explained or were insignificant in light of the overwhelming weight of other evidence Jasem submitted.   When the BIA issues a decision, we review only that decision, except to the extent that the BIA expressly adopts the IJ's decision. Chacon-Botero v. U.S. Atty Gen., No. 04-16422, manuscript op. at 5 (11th Cir. Oct. 6, 2005). "Insofar as the BIA adopts the IJ's reasoning, we will review the IJ's decision as well." Id. (internal quotation and marks omitted). Because the BIA expressly adopted, without opinion, the IJ's

reasoning as to Jasem's credibility, we review only the IJ's adverse credibility determination. See id. However, because the BIA articulated its reasons for adopting the IJ's other determinations, we review the decisions of both the IJ and the BIA in deciding Jasem's remaining arguments. See id. (reviewing the decisions of both the IJ and the BIA when the BIA expressly adopted the IJ's reasoning and briefly articulated its reasons for do so).

Furthermore, to the extent that the IJ's and the BIA's decisions were based on legal determinations, our review is de novo. D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 817 (11th Cir. 2004). On the other hand, the IJ's and the BIA's factual determinations are reviewed under the substantial evidence test, and we "must affirm the [] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Al Najjar, 257 F.3d at 1283-84 (quotation and marks omitted). "Under the substantial evidence test, we review the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc), cert. denied, 125 S.Ct. 2245 (2005). Thus, a finding of fact will be reversed "only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Id.

13

A credibility determination also is reviewed under the substantial evidence test; thus, we "may not substitute its judgment for that of the [IJ] with respect to credibility findings." D-Muhumed, 388 F.3d at 818. If credible, an alien's testimony may be sufficient to sustain the burden of proof without corroboration. Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005). "The weaker an applicant's testimony, however, the greater the need for corroborative evidence." Id. Indications of reliable testimony include consistency on direct examination, consistency with the written application, and the absence of embellishments. See In re B-, 21 I & N Dec. 66, 70 (BIA 1995); see also Dailide v. U.S. Att'y Gen., 387 F.3d 1335, 1343 (11th Cir. 2004) (affirming the BIA's adverse credibility determination, which was based upon its finding that the alien's testimony conflicted with his answers to interrogatories and other documentary evidence).

"Conversely, an adverse credibility determination alone may be sufficient to support the denial of an asylum application." Forgue, 401 F.3d at 1287. However, "an adverse credibility determination does not alleviate the IJ's duty to consider other evidence produced by an asylum applicant." Id. If an applicant produces evidence beyond his own testimony, "it is not sufficient for the IJ to rely solely on an adverse credibility determination in those instances." Id. Furthermore, "the IJ must offer specific, cogent reasons for an adverse credibility finding." Id. (quotation omitted). "Once an adverse credibility finding is made, the burden is on

the applicant alien to show that the IJ's credibility decision was not supported by 'specific, cogent reasons[,]' or was not based on substantial evidence." Id. (quotation omitted).[7]

Here, the IJ offered "specific, cogent reasons" for his adverse credibility finding. These reasons also were supported by substantial evidence in the record. To the extent the IJ cited to inconsistencies relating to the ages of Jasem's brothers, Jasem testified during his removal hearing that he was the youngest. Jasem, however, also testified during this hearing that "[m]y older brother's name is Falah Hassan Jasem. And my youngest brother's name is Kazim Hassan Jasem." Additionally, Jasem included in his asylum application, in explaining why officials questioned him about Falah's disappearance, that Jasem "was the first next person old enough for questioning (my brother's son is not old enough)." Although Jasem subsequently attempted to explain this inconsistency and why the officials had not, instead, questioned his older brother Kazim, by stating that Kazim was partially

_____

[7] Congress recently passed the REAL ID Act of 2005, Pub.L. No. 109-13, 119 Stat. 231 (May 11, 2005), which, among other changes, provides that reviewing courts now must give greater deference to an IJ's credibility determinations, and that inconsistences, inaccuracies, or falsehoods identified by an IJ giving rise to an adverse credibility determination may be made without regard to whether they were central to the applicant's claim. See INA § 208(b)(1)(B), 8 U.S.C. § 1158(b)(1)(B) (2005). The REAL ID Act, however, states that these provisions "shall apply to applications for asylum, withholding, or other relief from removal made on or after" the date the Act was enacted. See Pub.L.No. 109-13, 119 Stat. at 305. We have not issued a published opinion on either the applicability of these changes to credibility determinations, or when they take effect. Nevertheless, because the application of the Act to this case would not change the outcome, we need not decide these issues here.

15

deaf and illiterate, the IJ properly considered the consistency of Jasem's testimony with his written application. See Dailide, 387 F.3d at 1343. Moreover, this inconsistency related to Jasem's reason why he believed he was persecuted in the past and would be persecuted in the future.

Similarly, to the extent the IJ relied on Jasem's failure to include in his application for relief his testimony on being detained in a room with a snake in January 2000, a review of the record reflects that Jasem failed to mention this incident either during his initial interview with an immigration officer, as part of his credible-fear interview, or in his application for relief. Despite Jasem's cross-examination testimony during his removal hearing that he was beaten while he was detained in 1996, he neither stated that he was beaten during direct examination, nor in his application. Moreover, although Jasem submitted a voluminous amount of supporting documents on the country conditions in Iraq during Saddam Hussein's regime, along with evidence relating to his claim that he would face prosecution in a "special court" if he was returned to Iraq, he did not submit documentary evidence supporting his individual claims of past persecution. See Yang, 418 F.3d at 1201.

Thus, Jasem has failed to show that the IJ's adverse credibility determination "was not supported by 'specific, cogent reasons[,]' or was not based on substantial evidence." See Forgue, 401 F.3d at 1287. Regardless, as the government asserts

16

and as discussed below, even if the IJ erred in reaching its adverse credibility

determination, and even if Jasem established past persecution, he failed to establish

eligibility for asylum or withholding of removal because of changed country

conditions in Iraq.

**Issue 2:** **The IJ's and the BIA's determinations that humanitarian asylum was not warranted, pursuant to 8 C.F.R. § 1208.13(b)(1)(iii)**

Jasem also argues that the IJ erred in failing to consider that, even if a well-

founded fear of future persecution did not exist, a grant of humanitarian asylum

was warranted based on the severity and length of Jasem's past persecution.

Without citing to the record, Jasem contends that this exercise of authority was

warranted because he suffered ten years of interrogation, arbitrary detentions,

beatings, inadequate food and water, and severe psychological abuse and

intimidation. Jasem also asserts that, because his past persecutors remain in Iraq

and are being incorporated into the new government, he and his family still have

legitimate fears.

As discussed above, because the BIA commented on why it was adopting

the IJ's decision denying relief from removal, we review both the IJ's and the

BIA's decisions. See Chacon-Botero, No. 04-16422, manuscript op. at 5. An alien

who arrives in, or is present in, the United States may apply for asylum. INA

§ 208(a)(1), 8 U.S.C. § 1158(a)(1). The Secretary of Homeland Security and the

17

Attorney General have discretion to grant asylum if the alien meets the INA's definition of a "refugee." INA § 208(b)(1), 8 U.S.C. § 1158(b)(1).[8] A "refugee" is defined as follows:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . ..

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). "The asylum applicant carries the burden of proving statutory 'refugee' status." D-Muhumed, 388 F.3d at 818.

To establish asylum eligibility, the petitioner must, with specific and credible evidence, demonstrate (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor will cause future persecution. 8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1287. If the petitioner demonstrates past persecution, there is a rebuttable presumption that he has a well-founded fear of future persecution. 8 C.F.R § 208.13(b)(1). If he cannot show past persecution, then the petitioner must demonstrate a well-founded fear of future persecution that is both subjectively genuine and objectively

---

[8] Pursuant to the REAL ID Act, INA § 208(b)(1), 8 U.S.C. § 1158(b)(1), was amended to add "The Secretary of Homeland Security or the Attorney General," as if enacted on March 1, 2003. See INA § 208(b)(1), 8 U.S.C. § 1158(b)(1) (2005).

reasonable. Al Najjar, 257 F.3d at 1289. The subjective component can be proved "by the applicant's credible testimony that he or she genuinely fears persecution," while the objective component "can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." Id. (quotation omitted).

Jasem is not challenging on appeal the IJ's and the BIA's conclusions that, even if he established past persecution, the government rebutted the presumption of a well-founded fear of future persecution by establishing changed country conditions. Thus, we deem any arguments relating these determinations abandoned. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (holding that the petitioner abandoned the issue of the denial of relief under the CAT by not raising any challenges to it in her brief). Instead, Jasem is arguing that, despite these changed country conditions, the IJ and BIA abused their discretion in not granting him humanitarian asylum.

In Matter of Chen, 20 I & N Dec. 16 (BIA 1989), the BIA determined that, even if the presumption of future persecution arising from past persecution has been rebutted, an alien may have suffered such severe or atrocious forms of persecution at the hands of the former regime such that it would be inhumane to require the alien to return to his home country. Id. at 19. The BIA further explained:

19

> [T]here may be cases where the favorable exercise of discretion is warranted for humanitarian reasons even if there is little likelihood of future persecution . . .. It is frequently recognized that a person who—or whose family—has suffered under atrocious forms of persecution should not be expected to repatriate. Even though there may have been a change of regime in the country, this may not always produce a complete change in the attitude of the population, nor, in view of his past experiences, in the mind of the refugee.

Id. Applying this analysis, the BIA in Chen granted humanitarian asylum to an applicant who had been disabled by torture and the denial of medical care during China's "Cultural Revolution," and who was suffering from depression and suicidal thoughts. Id. at 19-21.

This category of asylum is now codified at 8 C.F.R. § 1208.13(b)(1)(iii), which provides that an IJ may grant an applicant humanitarian asylum on a discretionary basis if the applicant has demonstrated "compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution," or "a reasonable possibility that he or she may suffer other serious harm upon removal to that country." 8 C.F.R.§ 1208.13(b)(1)(iii)(A), (B). As discussed above, "[t]he burden of proof is on the applicant for asylum to establish that he is a refugee . . .. The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 U.S.C. § 1208.13(a).

We have not in a previous opinion applied this regulation. The BIA, however, has interpreted this form of relief to require an applicant first to show

20

"severe harm" and "long-lasting effects." See In re N-M-A, 22 I & N Dec. 312, 326 (BIA 1998); see also Mazariegos v. Office of U.S. Att'y Gen., 241 F.3d 1320, 1327 n.4 (11th Cir. 2001) (explaining that an agency's interpretation of its own regulations is entitled to "great deference," and that "[t]he degree of deference is especially great in the field of immigration").[9]

In the instant case, contrary to Jasem's argument on appeal, the IJ explicitly stated that he had considered the applicability of humanitarian asylum. Nevertheless, the IJ concluded that the record did not reflect that Jasem would face problems on his return to Iraq, other than those associated with earning a living. Indeed, at the time of the hearing, Jasem's wife, son, mother, four sisters, and a brother still were living in the Baghdad area. Moreover, although Jasem testified that, for a period of approximately ten years, he suffered repeated detentions and interrogations, including being beaten on one occasion and being placed in a room with a snake, he did not testify that this treatment resulted in "severe harm" or

---

[9] As persuasive authority, other circuits that have reviewed applications for humanitarian asylum have concluded that this relief is reserved for the most extraordinary cases. See Gonahasa v. U.S. INS, 181 F.3d 538, 544 (4th Cir. 1999) (holding that "[e]ligibility for asylum based on severity of persecution alone is reserved for the most atrocious abuse"); Bucar v. INS, 109 F.3d 399, 405 (7th Cir. 1997) (characterizing humanitarian asylum as being reserved for situations such as the German Jews, the victims of the Chinese "Cultural Revolution," and survivors of the Cambodian genocide); Krastev v. INS, 292 F.3d 1268, 1280 (10th Cir. 2002) (explaining that past persecution must have been so severe that it would "so sear a person with distressing associations with his native country that it would be inhumane to force him to return there, even though he is in no danger of future persecution") (internal quotation omitted).

21

"long-lasting effects." See In re N-M-A, 22 I & N Dec. at 326. Thus, we conclude that Jasem failed to show either extreme past persecution or compelling reasons why humanitarian asylum was warranted in his case. See 8 C.F.R. § 1208.13(a), (b)(1)(iii)(A), (B).

**Issue 3:** <u>**The IJ's and the BIA's conclusions that Jasem was not statutorily eligible for withholding of removal under the CAT**</u>

Jasem last argues that the IJ and BIA erred in failing to consider independently Jasem's claim for withholding of removal under the CAT. Jasem asserts that the IJ wrongly denied Jasem's claim for CAT relief based on the IJ's finding that Jasem lacked credibility, and, thus, ignored documentary evidence in the record reflecting that members of Saddam Hussein's regime still were torturing and killing Iraqi citizens. Jasem concludes that, because he established past torture and that opponents of the regime change in Iraq still are torturing civilians, his case should be remanded to the IJ for independent consideration of his CAT claim.

As discussed above, we review both the IJ's and the BIA's decisions denying CAT relief, see Chacon-Botero, No. 04-16422, manuscript op. at 5, and their factual determinations are reviewed under the substantial evidence test, see Al Najjar, 257 F.3d at 1283-84. To be entitled to mandatory withholding of removal under the CAT, an applicant must establish that it is "more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). "Torture" is defined as:

22

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected or having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1).

"Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture."  8 U.S.C. § 208.18(a)(2).  We have concluded that the burden of proof for an applicant seeking withholding of removal under the CAT, like that for an applicant seeking withholding of removal under the INA, is higher than the burden imposed on an asylum applicant.  Al Najjar, 257 F.3d at 1303-04.  Thus, if a petitioner fails to demonstrate a "well-founded fear of persecution" sufficient to support an asylum claim, he or she likewise cannot demonstrate "torture" sufficient to warrant relief under the CAT.  Id.

Here, because Jasem is not challenging the IJ's and the BIA's determinations that he failed to demonstrate a "well-founded fear of persecution," he cannot meet the higher burden of demonstrating "torture" sufficient to warrant CAT relief.  See id.  Regardless, even if Jasem established that, upon his return to Iraq, he will suffer "an extreme form of cruel and inhuman treatment" at the hands of his past

23

persecutors who have remained in Iraq, see 8 U.S.C. § 208.18(a)(2), his argument fails. Although Jasem is arguing that the IJ and the BIA erroneously relied solely on the IJ's adverse credibility determination in denying him withholding of removal under the CAT, the record reflects that the IJ and the BIA, at least implicitly, also examined Iraq's changed country conditions. Moreover, Jasem has not challenged the IJ's determination that, following the demise of Saddam Hussein's regime, Iraq's official government has changed, and these persecutors no longer are in control. Thus, applying § 208.18(a)(1)'s definition of "torture," Jasem failed to show that, on return to Iraq, he will be tortured by a "public official or other person acting in an official capacity." See 8 C.F.R. § 208.18(a)(1). The IJ's and the BIA's determinations that Jasem was not eligible for withholding of removal under the CAT, therefore, were supported by substantial evidence in the record and should be affirmed. See Al Najjar, 257 F.3d at 1283-84

Accordingly, we conclude that we are foreclosed under the IIRIRA from either remanding Jasem's case to the IJ or the BIA, or considering new evidence of changed country conditions. We also conclude that Jasem has failed to show that the IJ's adverse credibility determination was not supported by "specific, cogent reasons," or was not based on substantial evidence in the record. Jasem has failed to show that, assuming the availability of humanitarian asylum, this extraordinary relief was warranted in this case. Furthermore, because Jasem failed to show that

he will be "tortured" by a "public official" on his return to Iraq, the IJ's and the BIA's determinations that Jasem was not statutorily eligible for withholding of removal under the CAT was supported by substantial evidence. We, therefore, deny Jasem's petition for review.

**PETITION DENIED.**